LOUISVILLE & N. R. CO. v. BOSWORTH et al.

(District Court, E. D. Kentucky. August 31, 1915.)

No. 768.

1. TAXATION ⬤493(1)—ASSESSMENT—POWER OF COURTS TO REVIEW.

An assessment of property by a board charged with that duty is subject to review and revision by the courts, where it is found that the board did not follow the method prescribed by statute, or otherwise adopted some fundamentally wrong principle, although fraud is not shown.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 876; Dec. Dig. ⬤493(1); Appeal and Error, Cent. Dig. § 141.]

2. TAXATION ⬤376(1)—ASSESSMENT OF RAILROAD FRANCHISE—KENTUCKY STATUTES.

In computing the mileage of an interstate railroad company, for the purpose of the assessment of its franchise under Ky. St. § 4081, which requires the apportionment of the mileage as a factor in the apportionment of the capital stock valuation, the length of all the lines, either operated, owned, leased, or controlled by the company, in the state or elsewhere, is to be taken into consideration.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. ⬤376(1).]

3. CONSTITUTIONAL LAW ⬤209—"EQUAL PROTECTION OF LAWS"—CONTROL OVER GOVERNMENTAL AGENCIES.

The "equal protection of the laws" provision of the Fourteenth Amendment extends to each department of the state government in the exercise of its especial functions, and to all who represent the state as officers or agents, and the laws to which the provision refers are the laws of the state.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 678; Dec. Dig. ⬤209.

For other definitions, see Words and Phrases, First and Second Series, Equal Protection of the Laws.]

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. CONSTITUTIONAL LAW ☞229(3)—EQUAL PROTECTION OF LAWS—INEQUALITY OF TAXATION.

Where the Constitution of a state requires the equal taxation of all property, the enactment by the Legislature of laws, or the action of executive officers in enforcing them, which in either case results in the intentional assessment or taxation of one class of property at a higher rate than another class is a denial of the equal protection of the laws in violation of the Fourteenth Amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 685; Dec. Dig. ☞229(3).]

5. TAXATION ☞485(1)—ASSESSMENT—APPLICATION OF DIFFERENT STANDARDS OF VALUATION.

Where the assessing department of a state uniformly applies different standards of valuation to different classes of property, the result is necessarily inequality and discrimination in taxation, which must be presumed to have been intentional, and the same is true, although the assessments are made by different boards or officers.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 861; Dec. Dig. ☞485(1).]

6. CONSTITUTIONAL LAW ☞229(3) — ASSESSMENT — RAILROAD FRANCHISE — EQUAL PROTECTION OF LAWS.

The assessment of the franchise of an interstate railroad company in Kentucky by the state board of valuation and assessment at a sum noted on its record to be in the opinion of the board "less than 80 per cent." of its fair cash value, whereas it was shown that other property in the state was uniformly undervalued and assessed at not more than 60 per cent. of its fair cash value, held a discrimination against the company, which denied it the equal protection of the laws, in violation of the Fourteenth Amendment and entitled it to equitable relief.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 685; Dec. Dig. ☞229(3).]

7. CONSTITUTIONAL LAW ☞209—"DENIAL OF EQUAL PROTECTION OF LAWS."

By "denial of equal protection of the laws," under Const. U. S. Amend. 14, is meant to refuse to grant or to withhold equal treatment in conferring or securing rights or imposing or exacting performance of duties, intentionally to treat differently, or to discriminate in so doing.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 678; Dec. Dig. ☞209.

For other definitions, see Words and Phrases, First and Second Series. Equal Protection of the Laws.]

In Equity. Suit by the Louisville & Nashville Railroad Company against H. M. Bosworth, Thomas S. Rhea, and C. F. Crecilius, individually and as constituting the Board of Valuation and Assessment of the State of Kentucky, H. M. Bosworth, Auditor of Public Accounts of the State of Kentucky, G. B. Likens, Assistant Auditor, James Garnett, Attorney General, C. H. Morris, First Assistant Attorney General, M. M. Logan, Second Assistant Attorney General, O. S. Hogan, Third Assistant Attorney General, of the state of Kentucky, Victor A. Bradley, Commonwealth's Attorney for the Franklin Circuit Court, and W. C. Marshall, County Attorney of Franklin County, State of Kentucky. On final hearing. Decree for complainant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Henry L. Stone, Helm Bruce, Ed. S. Jouett, Wm. A. Colston and Robt. E. Fleming, all of Louisville, Ky., for plaintiff.

James Garnett, Atty. Gen., M. M. Logan, First Asst. Atty. Gen., C. H. Morris, Second Asst. Atty. Gen., O. S. Hogan, Third Asst. Atty. Gen., and John L. Rich, of Covington, Ky., for defendants.

COCHRAN, District Judge. This suit is before me for final decree. The plaintiff seeks thereby an injunction against the enforcement of the assessment of its franchise in this state for the year 1913. The amount of the assessment is $45,658,630. When it was brought another suit was pending in which plaintiff sought an injunction against the enforcement of the assessment for the year 1912, which amounted, substantially to the same sum, to wit, $45,428,074, and I had sustained a motion therein for a preliminary injunction on condition that the taxes on $22,899,300 thereof be first paid, which condition was complied with. In that connection I delivered an opinion reported in 209 Fed. 380. That suit is also before me for final decree and is disposed of by a separate opinion. Before bringing this suit plaintiff paid the taxes for the year 1913 on that sum, which left the assessment for enforcement only as to the balance of the $45,658,630. A preliminary injunction was granted on filing the bill.

The details of the assessment, showing the manner in which the board arrived at $45,658,630 as the value of the franchise, are these: The board first found the fair cash value of plaintiff's capital stock, hereafter termed its unit, to be $262,252,566. This valuation it arrived at by capitalizing at 6 per cent. what it took to be plaintiff's net income from operations on its own account for the year ending June 30, 1912, as of which date the assessment speaks, less what it took to be its net income from certain property which it took to be nontaxable. Plaintiff's reports to the Kentucky Railroad Commission and to the Interstate Commerce Commission as of that date state plaintiff's net income for that year to have been $18,052,905.12. This included the net income from the operation by plaintiff of three railroads, two in and one out of Kentucky, on account of the owners, which amounted to $1,439,604. The board deducted this sum from the total, leaving a balance of $16,613,301.12 of net income from operations on its own account. It then deducted from this balance the sum of $878,147 on account of its net income from such nontaxable property. This left a balance of $15,735,154, which capitalized at 6 per cent. gave the sum of $262,252,566, at which it valued the unit. The nontaxable property, the income from which was thus deducted, consisted of stocks in other corporations which owned property in this state and which had paid the taxes thereon. The deduction was based on sections 4085 and 4086, Kentucky Statutes, and the construction thereof by the Court of Appeals in the cases of Com. v. Walsh's Trustee, 133 Ky. 103, 117 S. W. 398, and Com. v. Fidelity Trust Co., 147 Ky. 77, 143 S. W. 1037. It then apportioned $92,181,766 of this sum to Kentucky. The sum so apportioned was 35.15 per cent. thereof. The percentage which it took was the percentage which the mileage operated by plaintiff in Kentucky on its own account was of the entire mileage so operated

230 F.—13

by it. The entire mileage so operated by it was 4,478.61, of which 1,574.41 was in Kentucky. It then added to the sum so apportioned $2,468,612, the excess in the value which it took that the portion of the unit in Kentucky was over such mileage proportion of the value thereof. It found this excess in value to be in the intangible part of the portion of the unit in Kentucky, and that in this way: The value of the tangible part it took to be $177,038,113, and that of the intangible $85,214,453. The proportion of the gross income derived from Kentucky of the entire gross income it took to be 38 per cent., or 2.85 per cent. in excess of such mileage proportion. It took it that this showed that the value of the portion of the intangible part of the unit in Kentucky was 2.85 per cent. of the value of such part, or the sum of $2,468,612 in excess of such mileage proportion thereof. Adding this sum to such mileage proportion of the value of the unit, to wit, $92,181,766, made the value of the portion of the unit in Kentucky $94,650,388. It then reduced this sum to that of $94,500,000 as the value. This reduction is not to be accounted for, except on the ground that it wanted to place the value of such portion in round numbers. This lessened the addition to such mileage proportion of the value of the unit on account of the excess in value of the portion of the intangible part of the unit in Kentucky over such mileage proportion thereof from the sum of $2,468,612 to $2,318,244, which latter sum was the difference between $94,500,000 and $92,181,766. But the board had no sooner made this reduction than it made a further reduction from this sum in round numbers to another sum, not in round numbers, to wit $75,139,402, as the value of the portion of the unit in Kentucky, and there it stayed. On the assumption that this sum was reached by reducing from $94,500,000, there is no accounting for how it reached it, rather than any other sum. The only account of it which it gave was that it so did "to be conservative, and out of an abundance of caution, to the end that no injustice may be done respondent in arriving at the value of the corporate franchise of respondent in this state." And it noted the fact that this sum was "less than 80 per cent. of that which it believes to be the fair cash value of Kentucky's proportion of the entire capital stock of respondent." It then deducted from this last sum the assessed value of the tangible property in Kentucky, to wit, $29,500,772, which left the sum of $45,-658,630 as the value of the franchise. Such is what the board did on the face of things.

In making the assessment for 1912 what the board did on the face of things was this: In the preliminary assessment it valued the portion of plaintiff's unit in Kentucky at $81,670,377, the manner in which it obtained such value not appearing, and then deducted therefrom the assessed value of the tangible property, to wit, $29,170,377. This left $52,500,000, which it fixed as the value of the franchise. In the final assessment it valued such portion at $74,598,451, the manner in which it obtained such value also not appearing, and then deducted therefrom such assessed value, to wit, $29,170,377. This left $45,428,074, which it fixed as the value of franchise. In my opinion in the case involving that assessment I took note (209 Fed. 460) of

the fact that it was possible, if not probable, that the board in making the preliminary assessment had obtained the value of the portion of the unit in Kentucky which it fixed at $81,670,377, not by first valuing the unit and then apportioning a part of such value to Kentucky, but by determining, in the first instance, that the franchise should be $52,500,000 and then adding the assessed value of the tangible thereto, and that in making the final assessment it merely made a reduction from the valuation so obtained to $74,598,451, at which it fixed it therein. In the case in hand one cannot avoid the suspicion, at least, that what the board really did was practically to adhere to the assessment for 1912 so reached—the change being only from $45,428,074, to $45,658,630—then to add the assessed value of the tangible property for 1913 thereto, which gave $75,139,402 as the value of the portion of the unit in Kentucky, deducting from which the assessed value of the tangible property gave the value of the franchise already fixed, and then to make the other figures to show that the sum at which it placed the value of the portion of the unit in Kentucky was less than 80 per cent. of its fair cash value. What lends color to this is the difficulty of determining how otherwise $75,139,402 was arrived at as the value of such portion. This tends to show that the assessment for 1913, as well as for 1912, was predetermined, and not the outcome of pursuing the method prescribed by the statute.

[1] The particulars in which plaintiff attacks the action of the board and the grounds thereof come next for statement. But before presenting them a preliminary contention of defendants should be noted and disposed of. It is that the action of the board is final and conclusive unless fraud on its part has been shown. It is contended that such is the case, even though it appears that the board did not follow the method prescribed by the statute. That such is their contention I quote from their brief. They say:

"This board is the judge of both the law and the facts, and its judgment as to the method followed is conclusive, unless fraud be proven tending to show that the board was actuated by fraudulent motives. These proceedings are not appeals from the judgments of the board of valuation and assessment. This court is not seeking for errors committed by this board. This court does not have the power to say whether the board followed an erroneous method in making the assessments, except as an incident to one thing, and that one thing is fraud. If there has been evidence showing fraudulent conduct on the part of the board, the court must consider other evidence touching on values and methods; but this court has no power to consider such things until after it is first shown that the assessment is void on account of fraud. If such state of facts should be shown, it would then be necessary for the court to take up the question of values, and in order to correctly ascertain values it would be necessary to consider methods."

And again they say:

"Until fraud is shown the court cannot consider any evidence as to either methods followed or as to values, but if fraud is shown the court must consider other matters in order to conclude whether the assessment is unjust."

They cite in support of this contention the following decisions of the Supreme Court of the United States, to wit: State Railroad Tax Cases, 92 U. S. 595, 610, 616, 23 L. Ed. 663; Kelly v. Pittsburg, 104

U. S. 78, 80, 26 L. Ed. 658; Pittsburg R. R. Co. v. Backus, 154 U. S. 421, 434, 435, 14 Sup. Ct. 1114, 38 L. Ed. 1031; Maish v. Arizona, 164 U. S. 599, 610, 611, 17 Sup. Ct. 193, 41 L. Ed. 567; San Diego L. T. Co. v. National City, 174 U. S. 739, 750, 19 Sup. Ct. 804, 43 L. Ed. 1154; C., B. & Q. R. R. Co. v. Babcock, 204 U. S. 585, 593, 596, 598, 27 Sup. Ct. 326, 51 L. Ed. 636.

These decisions should be generalized. The cases of Kelly v. Pittsburg and Maish v. Arizona go together. They are alike, in that they involved assessments of ordinary property—in the one case a farm, in the other stock cattle—by local officials. That of San Diego L. T. Co. v. National City stands by itself. It involved the exercise of an analogous function, to wit, fixing water rates by a local body. The other three go together. They are alike, in that they were railroad cases and involved the assessment of a portion of a railroad unit. In the State Railroad Tax Cases the units were intrastate, and the portions thereof covered by the assessments complained of were the intangible parts there; i. e., the franchises. In the other two cases, the units were interstate, and the portions thereof so covered were the parts in the state where the assessments were made. The statutes involved therein did not view such parts as parts of interstate units. The boards, however, in making the assessments, did. In neither of the five tax cases did the statute prescribe the method of making the assessment. In the State Railroad Tax Cases it authorized the board to adopt such method as might seem equitable and just, and the method it had adopted and applied was approved by the court. In neither of the others was there clear evidence that improper methods had been adopted and applied. As neither of them involved a case where a method prescribed by statute had not been followed, there is no basis for the claim that they support the position that, if it clearly appears that the board in making the assessment departed in certain particulars from the method prescribed by the statute, its validity is thereby unaffected, unless fraud has been shown.

This much is certainly to be gathered from these decisions: The judgment of an assessing official or board as to the value of ordinary property, such as a farm or stock cattle, is final, in the absence of fraud; and this, though its valuation may be thought to be "very greatly in excess of its true value." No method of valuing such property is ever prescribed; correct thinking does not call for any particular method for so doing; and as to the true value thereof there is room for fair-minded and reasonable men to differ. Possibly it is also to be gathered therefrom that if the property valued is the unit of a railroad company, even though it be interstate, in which case the valuation thereof is merely a step in the process of valuing the portion or a part of the portion thereof in the state, its judgment as to its value is final, in the absence of fraud, if no method for valuing such unit has been prescribed. It is true that two methods of valuing it have been adopted and applied, and approved by the courts, known as the stock and bond and capitalization of net earnings. But there is room for fair-minded and reasonable men to differ as to which is the best method, and, in each case, as to the details thereof. Besides, per-

haps, it cannot be said that the valuation should be limited absolutely to either method. It may be proper to consider other matters, such, for instance, as the cost of construction. And it may be a case for the exercise to some extent at least of what Mr. Justice Holmes in C., B. & Q. R. Co. v. Babcock terms the "intuition of experience."

But this is not all that is to be gathered therefrom. From the case of C., B. & Q. R. Co. v. Babcock it is to be gathered that the courts are not limited to fraud as the only ground for overthrowing such an assessment; that if, in making it, the board adopted a fundamentally wrong principle in any particular, the assessment is void; and that in determining whether such a principle was adopted the court is to no extent affected by the judgment of the board. As to this it is free to substitute its judgment for that of the board. And it would seem that it would make no difference that the principle was embodied in the statute under which it acted. In such a case it would be immaterial that there had been no fraud on the part of the board. Mr. Justice Holmes, in that case, speaking generally as to the validity of such an assessment, said that the judgment of the "lay tribunal" was intended to be final, "notwithstanding mistakes of fact or law." He, however, did not say that it was so intended absolutely, but only "so far as may be." He went further, and pointed out the grounds upon which it might be attacked. And in so doing he did not limit the right to attack to fraud. He said that the court had to do with nothing less than fraud, or a "clear adoption of fundamentally wrong principle"; and again, that the tribunal was the ultimate guardian of certain rights, except "in the case of fraud or a clearly shown adoption of wrong principles."

What he had in mind as covered by the second alternative appears from the cases of Louisville & Jeffersonville Ferry Co. v. Kentucky, 188 U. S. 385, 23 Sup. Ct. 468, 47 L. Ed. 519, and Fargo v. Hart, 193 U. S. 490, 24 Sup. Ct. 498, 48 L. Ed. 761. In the latter case it was held that certain personal property of the American Express Company located in New York was no part of its interstate unit, a portion of which was subject to taxation in the state of Indiana. The board of that state had taken it to be a part of the interstate unit and apportioned a part thereof thereto on the mileage basis. The Supreme Court held that in so doing it had erred. It substituted its judgment for that of the board and set the latter aside. There had been no fraud on the part of the board. The Sixth Circuit Court of Appeals had held likewise in the case of Coulter v. Weir, 127 Fed. 897, 62 C. C. A. 429. The other case was a Kentucky case. The board of valuation and assessment had taken the ferry franchise of the Louisville & Jeffersonville Ferry Company in Indiana to be a part of its interstate unit—which undoubtedly it was—and assessed it. The Supreme Court held that, notwithstanding it was a part of the company's interstate unit, it was not assessable to any extent in Kentucky. It substituted its judgment for that of the board and set the latter aside. There was no intimation of fraud on the part of the board.

If, then, it is the duty of the court to substitute its judgment for that of the assessing board, and to set the latter aside in making the

assessment, if it has adopted fundamentally wrong principles, clearly it not only has the right, but it is its duty, to so do if it determines that the board has not followed the method prescribed by the statute under which it acted and from which it obtained its power to act at all. And so the Court of Appeals of Kentucky has held in the cases of Hager v. American Surety Company, 121 Ky. 791, 90 S. W. 791, and James v. American Surety Company, 133 Ky. 313, 117 S. W. 411. If it then appears that, in some particular, the board in making the assessment in question here departed from the method prescribed by the statute, or adopted some fundamentally wrong principle, to the extent, at least, that such departure or adoption affects the amount thereof, it cannot stand.

The plaintiff attacks the valuation of the unit at several points. It urges that the capitalization should have been at 6.524 per cent., the average of the interest rates of the different states wherein plaintiff's unit lies, instead of 6 per cent.; that the true net income derived from operations by it on its own account was $15,862,099.26, instead of $16,-613,301; that the true net income from nontaxable property was $992,494.08, instead of $878,147; and that the deduction should not have been of the net income received from such property from that received from operations on its own account, but of the actual value of such property, which it places at $33,743,900, from the sum arrived at by capitalizing the net income from such operations. I think that the board's valuation of the unit is impervious to attack in this court on either of these grounds. I am not satisfied that the nontaxable stocks are really worth the amount claimed or more than the capitalization of their income. And I am not sure that plaintiff is entitled to any deduction on this ground. I am sure that it is not my province to substitute my judgment for that of the board as to the rate of interest at which plaintiff's income should be capitalized in valuing its unit on the capitalization plan. The other two particulars in which the valuation of the unit is attacked are for mistakes of fact; and, conceding them to have been made, it is not in my power to correct them. So that in disposing of this case the value of the unit will have to be taken to be at least as much as $262,252,566, the amount found by the board.

[2] The plaintiff next attacks the action of the board in limiting itself to the mileage operated by it, and, as to it, to that operated by it on its own account, in arriving at the portion of the value of the unit to be apportioned to Kentucky. It claims that in so doing it should have considered all the mileage operated by it, and also that owned, but not operated, by it, and that operated by separate organizations, which it controlled either by virtue of ownership of a majority of capital stock or as joint owner or lessee, heretofore referred to as controlled mileage. The miles operated by it on its own account, as we have seen, were 4,478.61, of which 1,574.41 were in Kentucky; those operated by it on account of the owners were 221.86 of which 21.42 were in Kentucky; those owned, but not operated, by it were 269.45, of which 70.11 were in Kentucky; and those controlled by it were 2,937.89, of which 286.45 were in Kentucky. Adding the miles operated by it on its own account and on the owner's account, and those owned, but not

operated, by it, and those controlled by it together, gives 7,907.83 as the total number, of which 1,952.45 were in Kentucky. The percentage which the latter sum is of the former is 24.9601. It is this percentage, rather than that of 35.15, which it claims the board should have taken in apportioning a part of the value of the unit to Kentucky. And it bases this position on the express requirement of the statute. The proportion of the value of the unit which it prescribes is that "which the length of the lines operated, owned, leased or controlled in this state bears to the total length of the line owned, leased or controlled in this state and elsewhere." Beyond question the word "operated" was omitted by mistake in referring to the total length of the lines, and the clause should be read as if it had been inserted there as well as in the first instance.

It seems to me that this position is sound. I so held in the case of L. & N. R. R. Co. v. Coulter (C. C.) 131 Fed. 306, and the decision of the Kentucky Court of Appeals in the case of Com. v. L. & N. R. R. Co., 149 Ky. 829, 837, 150 S. W. 37, is to the same effect. That was a proceeding by an auditor's agent to have certain property of the plaintiff herein assessed for the year 1909 as omitted property. One basis for claiming that it had been omitted was that the board of valuation and assessment had not properly assessed its franchise, in that it had taken into consideration the controlled mileage. Clay, C., in delivering the opinion of the court, said:

> "But there is an attempt to show that in this case the property sought to be assessed as omitted property was not included in the capital stock valuation, because the board of valuation and assessment, in fixing the capital stock, considered other roads controlled by the Louisville & Nashville Railroad Company, through stock ownership, but which were operated by their own organizations. The statute requires that the railroad company shall report to the auditor of public accounts its entire lines 'operated, owned, leased or controlled' in and out of the state. If the railroad company owns a majority of the stock of another company, so that it may elect its directors and dictate its policy, there can be no doubt that it controls it within the meaning of the statute, and that such other railroad should be included in the report required to be made to the auditor. If required to be reported, the board of valuation and assessment may take them into consideration in fixing the value of the franchise of the controlling company in * * * Kentucky. That being true, the allegations in the second paragraph of the petition are not sufficient to show that the board of valuation and assessment, in fixing the value of appellee's franchise, adopted a plan different from that provided by the statute."

The plaintiff next attacks the action of the board in adding first $2,-468,612 and finally $2,318,244 to the mileage proportion of the value of the unit on account of excess of the value of the portion of the intangible part of the unit in Kentucky over the mileage proportion thereof. The board based its action in making this addition to such mileage proportion of the value of the unit on what it conceived I had held in the other case. I there took the position that the statute did not limit the assessment to the mileage proportion of the value of the unit, but contemplated that, if the portion of the unit in Kentucky was in fact of greater value than the mileage proportion of the value of the unit, the board, after ascertaining such proportion, should add thereto the excess in value, so that the value of such portion would represent the

true fair cash value thereof, and, further, that the method of ascertaining whether the portion of the intangible part of the unit in Kentucky exceeded in value the mileage proportion of its value, and, if so, the extent to which it exceeded it, was to determine the proportion that the gross income derived from Kentucky was of the entire gross income, and if it exceeded the mileage proportion the excess percentage of the value of the unit was to be taken as the excess in value.

The plaintiff, in making its attack on this part of the action of the board, contends that it is impossible to determine how much of the gross income of an interstate unit has been derived from a given state otherwise than on the mileage basis, and that therefore in no case can the intangible part of the unit therein exceed in value the mileage proportion of the value thereof. It claims that this position finds support in the decision of the Court of Appeals of Kentucky in the case of Southern Ry. Co. v. Coulter, 113 Ky. 657, 675, 676, 68 S. W. 873, and, further, that every case wherein the Supreme Court of the United States has taken note of the fact that the portion of an interstate unit in one state might exceed in value the average value per mile involved a case of excess in the tangible part, where there is a manifest physical difference which can be seen and measured by some rational and reasonably accurate judgment, such as extensive and expensive terminal property existing in one state, which does not exist in the other state into which the line extends, or where an extra amount of rolling stock is required in one state and not in others, which are illustrations given in the case of Pittsburg, etc., v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114, 38 L. Ed. 1031, and had in mind in the case of Fargo v. Hart, 193 U. S. 490, 24 Sup. Ct. 498, 48 L. Ed. 761. And it might be added that in the case of Erie R. R. Co. v. Pennsylvania, 21 Wall. 492, 22 L. Ed. 595, which involved a tax on the gross receipts of an interstate railroad in Pennsylvania, the extent of the gross receipts therein was obtained by apportioning them on the mileage basis.

In taking the position I did on this subject I cannot say that I was sure of my ground. The problem was a difficult one, and I had not had the benefit of any suggestions of counsel in regard thereto. It had not been dealt with in any other case, so far as I was able to find. It was not then a vital question, necessitating that I should be sure of my ground. Nor am I any surer now than then as to the soundness of the position. The necessities of this case also do not require that I should absolutely commit myself on the question. What made me then, and makes me still, think that the portion of the intangible part of an interstate unit in a given state may be greater in value than the mileage proportion of the value thereof is the case of W. U. Tel. Co. v. Massachusetts, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790. There an apportionment of a part of the interstate unit of the telegraph company to the state of Massachusetts on the mileage basis was upheld, notwithstanding that the value of the portion of the tangible part of that unit in that state was less than the mileage proportion of the value thereof, and this seems to have been done on the ground that the value of the portion of the intangible part thereof in that state was greater than the mileage proportion of the value thereof, and that because the

gross income derived from that state exceeded the mileage proportion of the gross income. What relieves me of the necessity of so committing myself is that, if my position so followed by the board be conceded to be sound, but one possible method to determine with any degree of accuracy the amount of the gross income derived from Kentucky, apart from the mileage basis, occurs to me, and the board not only did not pursue that method, but adopted a method that clearly did not yield the true amount thereof. The possible method to which I have reference is first to separate the interstate and intrastate gross income, then apportion to Kentucky a part of the interstate gross income on the mileage basis, and then add thereto the intrastate gross income. As stated, the board did not follow this method. It did not have the data which would enable it to follow it. It took what plaintiff in its report to the Kentucky Railroad Commission for the year ending June 30, 1912, gives as its Kentucky gross income as the true gross income derived from Kentucky.

But it clearly appears that the amount so reported was not obtained by the method I have suggested. It represented the gross income from traffic which originates and terminates in Kentucky and traffic which originates in Cincinnati, Ohio, where plaintiff has an important terminal, and passes entirely through Kentucky to states south of her. The fact that plaintiff in this report termed this income as Kentucky gross income or earnings did not prevent it from showing its true character. Other interstate railroad companies operating in Kentucky used this title in their reports and this in a different sense. The Cincinnati, New Orleans & Texas Pacific Company confines it to income from traffic which originates and terminates in Kentucky. It omits that arising from traffic which passes through the state of which there must be a large amount; and the Chesapeake & Ohio Railway Company confines it to income arising from traffic which originates in Kentucky. It is clear, therefore, that in this particular also the action of the board was not well taken. It cannot, however, be said that, in taking it, it did not follow the statute, or did that which the statute prohibited it from doing. The statute contains no provision on the subject. All that can be said is that the board in so doing adopted a fundamentally wrong principle, and this I think can be truly said.

In this connection I would restate with some difference the position which I took in the other case, to the effect that the board was limited to a consideration of the mileage proportion—i. e., the proportion which the mileage of that part of the unit which was in Kentucky was of the entire mileage thereof—of the value of the capital stock in apportioning a part of such value to Kentucky, and could not consider the proportion derived from averaging the mileage, gross income, and net income proportions of the value thereof in so doing. I emphasized the fact that what the statute provided the board should consider was not the mileage proportion, but the mileage proportion of the value of the capital stock. I would not repeat this emphasis. A consideration of the mileage proportion, in averaging it with the gross income and net income proportions, so as to obtain an average proportion to be used in apportioning a part of the value of the capital

stock to Kentucky, could be excluded, and the consideration limited to the mileage proportion of the capital stock, and exactly the same result obtained as if the mileage proportion were so considered. This would be by apportioning to Kentucky the mileage proportion of the value of the capital stock, the gross income proportion thereof, and the net income proportion, and then averaging the three. What excludes an apportionment to Kentucky of such average proportion of the capital stock, or the gross or the net income proportions of such value and then averaging them with the mileage proportions thereof, is the fact that the statute provides that the board shall consider the mileage proportion of the value of the capital stock, and says nothing about such average proportion, or the gross or net income proportions thereof.

That the statute (Ky. St. § 4081), in providing that the board should consider the mileage proportion of the value of the capital stock, meant that it should, after valuing the capital stock, as a step in the process of valuing the franchise, apportion a part of such value to Kentucky on such basis, follows from the fact that it contemplated that the franchise should be valued as a part of an interstate unit, the first step in which was to value the unit. There was no way to pass from this first step to the last one—i. e., valuation of the franchise—except by taking a mileage proportion of the value of the unit. It was not necessarily the only intermediate step. The intermediate steps might include an addition or subtraction on account of the portion of the unit in Kentucky exceeding or being less than the mileage proportion of the value of the unit. But it was necessarily one of the intermediate steps. Had the statute not limited the board's view of the franchise to it as part of an interstate unit, and permitted it to view it independently of its being so, a provision that the board in valuing it should consider the mileage proportion of the value of the unit would not necessarily mean that it should apportion a part of the value of the unit on such basis to Kentucky as a step in valuing the franchise. It could mean no more than that it should be considered merely for the purpose of determining whether the valuation of the franchise, otherwise reached, was correct or not. I have had difficulty in reaching a conclusion as to just what the statute means in providing that the board shall consider the mileage proportion of the capital stock, and this is the best that I can make of it.

These, then, are all the attacks made upon the action of the board save one, yet to be mentioned and considered. Apparently the effect of the conclusions so far reached, to wit, that the board's valuation of the unit at $262,252,566 cannot be lessened by me, that the percentage of the valuation of the unit which the statute requires to be taken is not 35.15, as the board took it to be, but 24.9601, and that no addition can be made to the part of the value of the unit apportioned to Kentucky on the mileage basis on the ground that the part of the intangible part of the unit in Kentucky was more valuable than the mileage proportion of the value of such part, is that the value of such portion must be taken to be 24.9601 per cent. of $262,252,566, or $64,-750,418.79. But this is so apparently only. It is not really so, because

the board, in reaching $262,252,566 as the value of the unit, did not value the whole of the unit. If there was more of the unit than what it valued, if what it valued was worth $262,252,566, and if 24.9601 was the proper percentage of the value of the unit to be apportioned to Kentucky—I have accepted the second and held the third condition to be true—then the value of the portion of the unit in Kentucky was not $64,750,418.79. It was more than such sum.

Is it true, then, that the board did not value the whole of the unit, and, if so, to what extent did it come short of so doing? To answer this question it is essential that we come to an understanding as to what the unit consisted of. To do this it is only necessary that we hark back to a conclusion we have already reached. It is a conclusion which plaintiff has urged upon me, and which I have accepted as sound. That conclusion is that the proportion which the part of the unit in Kentucky was of the whole unit was 24.9601. To determine what that proportion was, two things had to be known, to wit, the extent of the unit (i. e., the miles in it) and the extent of the part thereof in Kentucky (i. e., the miles in such part). It was found that the miles in the unit were 7,907.83, and those in the part of the unit in Kentucky were 1,952.45. And in obtaining these figures all the mileage operated, owned, leased, and controlled—altogether and in this state— was considered. The unit, therefore, consisted of all such mileage. That such was the thought of the statute appeared from its provision that the board, after valuing the capital stock, should apportion to this state the proportion of such mileage in this state to the whole of such mileage.

Now the board, in valuing the unit, did not value the whole of such mileage. It valued only so much thereof as was represented by plaintiff's net income, or would have been represented by its stock and bonds, had that method of valuation been adopted. And that income, or those stocks and bonds, did not represent the whole of such mileage. It represented only such portion thereof as was represented by the stock and bonds of the separate organizations held by it, or as it held as joint owner or lessee. It did not represent such portion thereof as was represented by the stock and bonds of such organizations held by others, or its co-owners or colessees held. To the value of so much of the unit as the board valued—i. e., that portion thereof represented by its net income or its stock and bonds—it should have added the value of so much of the controlled mileage as was not so represented. Had it so done, it would have valued the whole of the unit. Not having so done, it did not value the whole thereof.

But it may be urged by plaintiff that to value more of the unit than so much thereof as was represented by its net income or stock and bonds would be to go beyond the statute. What the statute provides it shall value in the first instance is plaintiff's capital stock; i. e., all its property tangible and intangible. Such is undoubtedly the wording of the statute. But to confine one's self thereto is to stick in the bark. The words "capital stock" in the statute are not used in any technical sense; and I do not think that they are used in any other sense than the unit—a part of which the statute provides shall be ap-

portioned to Kentucky. To give them a restricted meaning is to attribute to the Legislature an intention to provide that, in arriving at the percentage that is to be apportioned to Kentucky, the whole of the controlled mileage is to be treated as a part of the unit, as well as that operated, owned and leased, but in arriving at the value of that which is to be apportioned only a portion of the controlled mileage shall be considered, which necessarily would result in an undervaluation of that portion of plaintiff's unit in Kentucky. In my opinion in the other case I called attention to the fact that the statute under which the assessment in question was made was a crude piece of legislation, and I noted (209 Fed. 419, 420) a number of imperfections in it. The detailed consideration which I there gave it finds its justification in the fact that it makes one fair towards it in arriving at its true meaning. It was its intent that the board, in assessing the franchises of interstate units, should value the whole of the portion of such unit in this state. In order to do this it was essential that it consider the whole of the unit in valuing it, as well as in ascertaining the percentage thereof in this state. For it not to do so would be for it to omit a portion of the unit in this state, and undervalue the franchise.

In holding that it was the duty of the board to add to the valuation of what it valued the value of that portion of the controlled mileage in which plaintiff had no interest, in order to arrive at the value of its unit, I am unable to see that any property out of the state will be imported into it and the Fourteenth Amendment violated. And I am not sure that an injustice has not been done to the state by the Legislature in plaintiff's case in requiring that controlled mileage should be considered as a part of its unit. There are not sufficient facts before me to enable me to form any opinion as to this.

This holding necessitates that the board shall take a step in addition to any that has heretofore been mentioned, and that is this: After valuing the whole of the unit, as I have indicated, and apportioning 24.9601 per cent. thereof to this state, it should, before deducting the assessed value of the tangible property, deduct the value of so much of the controlled mileage as is in this state; otherwise it will be considered twice in assessing franchises. It will be considered in the assessment of plaintiff's franchise and also in assessing the franchises of the separate organizations which own it.

I come, then, to the remaining attack made by plaintiff upon the board's action which has heretofore been referred to. It is that its finding that the value of the portion of plaintiff's unit in this state was $75,139,074 was contrary to the Fourteenth Amendment, in that thereby it was denied the equal protection of the laws. The way in which plaintiff makes this out is this: Property in this state generally—i. e., property subject to assessment by the county assessors, constituting the bulk of the property therein subject to taxation—was uniformly and intentionally assessed for the year 1913 at less than 60 per cent. of its fair cash value; whereas, the board, in valuing the portion of plaintiff's unit in this state in making the assessment of its franchise for that year, consciously adopted and applied a much higher standard of

valuation than 60 per cent., certainly as much as slightly less than or about 80 per cent., and possibly full fair cash value. The board has left it ambiguous—perhaps purposely so—as to which of two standards it applied in reaching that valuation. There is room to claim that it applied thereto the standard of fair cash value, notwithstanding it noted the fact that the valuation which it made was less—i. e., slightly less—than 80 per cent. of what it believed was its fair cash value. It stated that the reduction which it made from the sum of $94,500,000 to that of $75,139,074 was made in order to be "conservative," "out of abundant caution," and "that no injustice be done plaintiff in arriving at the value of its franchise." This would seem to mean that it was made in order that it might be sure that it was valued at its fair cash value and no more. If such is its meaning, then the standard applied was that of fair cash value.

In the other case, I attempted to show (209 Fed. 460, 461, 462) that the claim made before the oral argument on the motion for preliminary injunction by the defendants, through the affidavits of the members of the board as to the assessment of 1912, was that the standard applied was that of fair cash value, and the assessment for 1913 is substantially the same as that. Besides, from the beginning of this litigation down to the present time, defendants have claimed, not only that the board had the right, but that it was its duty, to make the assessment at fair cash value, and the members thereof would violate their oaths if they did not do so; and the Attorney General of the state so advised the board in the course of the making of the assessment for 1913. Yet, assuming that what the board really did was, after valuing the portion of plaintiff's unit at $94,500,000, to make a reduction therefrom to $75,139,074, it is not unlikely that it so did, if not to equalize plaintiff's assessment with that of other property, at least to render what it did impervious to attack on the ground that such property was uniformly and intentionally undervalued. In that case there is a touch of insincerity here in putting the matter as the board did and not saying expressly that the reduction was made for that purpose. In the answer herein the defendants claim that it was made for that purpose. If so, the standard applied by the board in valuing the portion of plaintiff's unit in Kentucky was slightly less than—or, as the answer has it, about—80 per cent., which is much higher than the standard claimed to have been applied in the assessment of other property.

The ground of the attack now to be considered may be taken to be that the board, in applying any standard above 60 per cent., adopted a fundamentally wrong principle. If, then, it be a fact that property generally in this state was so assessed, was the action of the board contrary to the Fourteenth Amendment? In my opinion in the other case I considered quite at length whether in such a case the amendment would be violated, and reached the conclusion that it would. The defendants, however, still contend earnestly and sincerely that this position is wrong. This and the desire to develop accurately just what is essential in such a case to constitute a violation of the amendment leads me to consider the matter afresh. I hope to be able to put it so lucidly and forcibly that it cannot but be accepted as sound. I will first limit

myself to the amendment itself and then consider the relevant decisions.

[3] It is impossible for one to see things just as they are and not otherwise, unless they are viewed from the right standpoint. The right standpoint from which to view an alleged violation of the Fourteenth Amendment is above its letter. It should be viewed from its real meaning. The letter of the amendment is that no state shall deprive or deny. Its real meaning is that no one who represents the state, acting for it and in its name, shall deprive or deny. This is its meaning, just as much so as it would have been, had it been so worded, instead of as it is. Such is its real meaning, because it cannot mean anything else; and it cannot mean anything else because, literally speaking, a state cannot act at all. Those representing it as officers or agents alone can act. The prohibition thus being against those representing the state as officers or agents, and not the state itself, it is against all such persons. It is not limited to the legislative department of the state government. It includes the executive and judicial departments as well. The positions thus taken find ample support in the following references, to wit: Ex parte Virginia, 100 U. S. 339, 346, 25 L. Ed. 667; Poindexter v. Greenhow, 114 U. S. 270, 290, 5 Sup. Ct. 903, 29 L. Ed. 185; C., B. & Q. R. R. Co. v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; Raymond v. Chicago T. Co., 207 U. S. 20, 28 Sup. Ct. 14, 52 L. Ed. 90; Home T. & T. Co. v. Los Angeles, 227 U. S. 278, 33 Sup. Ct. 312, 57 L. Ed. 510. The decision in the case of Barney v. New York, 193 U. S. 430, 24 Sup. Ct. 502, 48 L. Ed. 737, so far as it is to the contrary, is no longer in force. In the case of C., B. & Q. R. R. Co. v. Chicago Mr. Justice Harlan said:

"The prohibitions of the amendment refer to all the instrumentalities of the state, to its legislative, executive, and judicial authorities, and therefore whoever, by virtue of public position under a state government deprives another of any right protected by that amendment against deprivation by the state, 'violates the constitutional inhibition; and as he acts in the name and for the state, and is clothed with the state's power, his act is that of the state.' This must be so, or, as we have often said, the constitutional prohibition has no meaning, and 'the state has clothed one of its agents with power to annul or evade it.'"

What "laws," then, are they the equal protection of which the legislative, executive, and judicial departments of the state are prohibited from denying? They can only be the laws which those departments have to do with and the only laws which they have to do with are the laws of the state in which they are such departments. And they are prohibited from denying the equal protection of such laws only in so far as they have to do with them. It cannot be that they are prohibited from so doing to any extent beyond this. The only connection which the legislative department has with the laws of the state of which it is such department is in their enactment. It has nothing to do with their enforcement. And the only connection which either the executive or judicial departments has with such laws is in their enforcement. Neither has anything to do with their enactment. What has thus far been said comes to this. The legislative department, in exercising its function of enacting the laws of the state of which it is such department, is

prohibited from denying the equal protection thereof; and the executive and judicial departments, in exercising the function of enforcing the laws of the state to which they belong, are prohibited from denying the equal protection thereof.

And what is it, then, to deny the equal protection of those laws? It is to refuse to grant or to withhold equal treatment in conferring or securing rights or in imposing or exacting performance of duties. It is to treat differently or to discriminate in so doing. And it may be said to include an intention, in doing what is done, to treat differently or to discriminate. But, if such is the natural consequence of what is done, it is to be taken that there was an intention to treat differently or to discriminate. One is always held to intend that which is the natural consequence of what he does. The essence of the Fourteenth Amendment, therefore, is to forbid discrimination and to require equal treatment on the part of each department of the state in the exercise of its particular function, and its effect is to empower and to make it incumbent on the courts, state and federal, to prevent discrimination and to secure equal treatment.

What has just been said, however, calls for some modification. In the case of Magoun v. Illinois Trust Co., 170 U. S. 280, 18 Sup. Ct. 594, 42 L. Ed. 1037, Mr. Justice McKenna, in referring to the equality of treatment which the legislative department in enacting the laws of the state is thereby required to give, stated that it is not a "rigid equality." It permits "many practical inequalities." The discrimination by such department which is forbidden is an arbitrary discrimination. A reasonable discrimination is not forbidden. But it is to be borne distinctly in mind that this freedom to discriminate is on the part of the legislative department, and that in the absence of any restriction on its power in the Constitution of the state. The legislative department, in so doing, has no such freedom, if its Constitution forbids, nor have the executive and judicial departments, in any case, any such freedom in enforcing such laws. Where the Constitution of the state forbids discrimination on the part of the legislative department in enacting its laws, I opine that a rigid equality—i. e., as much equality as the matter permits—is called for; and I see no reason why, if a rigid equality is not given, the Fourteenth Amendment is not violated, as well as the state Constitution. Equality is denied where no right to deny it exists. If there is a statement anywhere as to the equality of treatment which the executive and judicial departments must give in enforcing the laws of the state, it has escaped me. I would think that it is more rigid than that required to be given by the legislative department in enacting laws, where there is no restriction on its power in the Constitution of the state. Possibly it must be as much equality as the case permits; but possibly, also, it is sufficient if there is no intentional discrimination. Certainly an intentional discrimination is forbidden.

[4] These general statements as to discrimination forbidden and equality of treatment required should be applied to tax laws. So doing, we find that in the case of such laws we have an instance in which discrimination is not absolutely forbidden by the amendment. In the

case of Davidson v. New Orleans, 96 U. S. .97, 24 L. Ed. 616, Mr. Justice Miller said:

"The federal Constitution imposes no restraints on the states in regard to unequal taxation."

And in the case of Bell's Gap Railroad v. Pennsylvania, 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892, Mr. Justice Bradley said that the Fourteenth Amendment was not "intended to prevent a state from adjusting its system of taxation in all proper and reasonable ways."

But, if the Constitution of the state forbids unequal taxation, the legislative department in enacting tax laws has no right to make a discrimination, and, as stated, if in such a case it does discriminate, I see no reason why its action would not be in violation of the Fourteenth Amendment as well as of the state Constitution. Thereby the equal protection of the laws of the state would be denied, and by reason of the Constitution of the state the right to discriminate which might otherwise exist has been taken away. Such a law might impose a tax of $1 on the $100 on an owner or the owners of one class of property and 60 cents on the $100 on all other owners. No one would contend that in such a case the owner or owners of the class of property on whom the highest rate of tax had been imposed had not been denied the equal protection of the laws. Or it might take the shape of providing that the owner or owners of property of the one class should pay 50 cents on the $100 on an assessment thereof at its full fair cash value, and that all the other owners should pay the same rate on an assessment thereof at 60 per cent. of its fair cash value. No one would contend that in this case, as much so as in the other, the former owners were denied the equal protection of the laws. In the case of Bank v. Hines, 3 Ohio St. 15, as quoted by Mr. Justice Miller in the case of Cummings v. Merchants' National Bank, 101 U. S. 153, 25 L. Ed. 903:

"Taxing by uniform rule requires uniformity, not only in the rate of taxation, but also uniformity in the mode of the assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of the assessment, as well as in the rate of taxation."

In the one case the denial would consist in prescribing the rate of taxation, and in the other in prescribing the rate of valuation of the property subject to taxation. So much as to the denial by the legislative department in the enactment of laws as to taxation. I pass therefrom to a denial by the executive and judicial departments—more particularly the assessing branch of the executive department, whose function is characterized as quasi judicial—in the enforcement of such laws by assessing property subject to taxation, and that where the Constitution and statutes of the state, as is the case here, require uniform taxation. It must be conceded that there is no such thing as perfect equality in the assessment of property for taxation. In the State Railroad Cases (92 U. S. 612, 23 L. Ed. 663) Mr. Justice Miller thus expressed himself on this subject:

"Perfect equality and perfect uniformity of taxation as regards individuals or corporations, or the different classes of property subject to taxation, is a

dream unrealized. It may be admitted that the system which most nearly attains this is the best. But the most complete system which can be devised must, when we consider the immense variety of subjects which it necessarily embraces, be imperfect. And when we come to its application to the property of all the citizens, and of those who are not citizens, in all the localities of a large state like Illinois, the application being made by men whose judgment and opinions must vary as they are affected by all the circumstances brought to bear upon each individual, the result must inevitably partake largely of the imperfection of human nature and of the evidence on which human judgment is founded."

The inequalities due to the imperfections thus referred to cannot, therefore, be within the purview of the amendment. Those inequalities only can be within its purview which need not be; and such are inequalities due to intentional discrimination. The assessing department can refrain from such discrimination and thereby prevent inequalities due to that cause. It must be accepted, therefore, that intentional discrimination on the part of that department is contrary to the amendment. Such, then, is the ultimate fact upon which a case such as we have here must turn.

[5] How, then, is such a discrimination to be made out? It is made out if it is established that the assessing department has adopted and applied a rule prescribing different standards of valuation of the property of different persons or different classes of property. The natural consequence of the application of such a rule is inequality and discrimination, and, as in law one is taken to intend the natural consequences of his acts, a discrimination so brought about is intentional. It may be made out by evidence that one class of property has uniformly been assessed at one degree of value and all other property at another. The fact of uniformity has to be accounted for, and there is no accounting for it except on the basis that a rule prescribing such degrees of value as the standard of assessment has been adopted and applied. In this connection the adverbs "systematically" and "habitually" are frequently used. I prefer uniformity. They all come to the same thing. Where the discrimination complained of is against a single owner of property, it is made out by evidence of an acknowledgment on the part of the assessing department that a rule prescribing the higher standard was adopted and applied, and of uniform assessment of all other property at a lower degree of value. If, then, in a given case it is established that the assessing department of the state has uniformly assessed the property of interstate railroad companies at fair cash value of slightly less than or about 80 per cent. thereof, and has uniformly assessed all other property at less than 60 per cent., a case of intentional discrimination against each railroad company and violation of the Fourteenth Amendment is made out; or that, in its assessment of the property of a single such company, it stated that the assessment was at its fair cash value, or slightly less than or about 80 per cent. thereof, the valuation conforming thereto, and has uniformly assessed all other property at less than 60 per cent., a case of intentional discrimination against such railroad company is made out.

Thus far I have proceeded on the assumption that the assessing department is administered by a single board or individual, supposing

that were possible.   How is it in a case where, as in this state, the bulk of the property—i. e., all but the franchises of corporations having special privileges and distilled spirits—is assessed primarily by a county assessor in each county, with county boards of supervisors over each assessor, and a state board of equalization over the assessments of each county, and such franchises and distilled spirits are assessed by a state board of valuation and assessment?   Clearly, if all having to do with the assessment of property in any way were to meet in convention at the state capital or elsewhere, and adopt a rule whereby all property assessable by the board of valuation and assessment, or portions thereof, such, for instance, as the franchises of corporations having special privileges, or those only of them which are interstate railroad companies, or that of a single such company, was to be assessed at its full fair cash value, or slightly less than or about 80 per cent. thereof, and that all other property that was subject to assessment by the county assessors was to be assessed at 60 per cent. of fair cash value, and such rule was applied in making the assessment, the discrimination would be an intentional one, and contrary to the Fourteenth Amendment.   But suppose no convention of or conference among any of the assessing officers is ever had, but each county assessor for himself adopts and applies a rule by which the property assessable by him is to be assessed at 60 per cent. of its fair cash value, either because he has heard of other county assessors having done so, or as a mere coincidence—a "developmental coincidence," resulting from the minds of the several assessors functioning the same way—which assessments are permitted to stand by the county boards of supervisors and the state board of equalization, and the board of valuation and assessment adopts and applies a rule prescribing full fair cash value, or slightly less than or about 80 per cent. thereof, as the standard in the assessment of the franchises of interstate railroad companies, or applies such a standard in the case of the assessment of a single such company, is there possible room for any one to claim that such a discrimination against such company or companies was not as much within the Fourteenth Amendment as if it had been brought about by the adoption and application of a single rule at a convention of all the assessing officers?

What reason is there for making a difference between a discrimination brought about by the conjunction of many separate rules and one brought about by a single rule?   The discrimination is as much an intentional discrimination in the one case as in the other.   And in such a case, if the property in each county was uniformly assessed at 60 per cent. of its fair cash value, and in the assessment of the franchises of interstate railroad companies the portions of the unit in the state were uniformly valued at full fair cash value, or at slightly less than or about 80 per cent. thereof, the reasonable inference would be that each county assessor and those over him had adopted and applied a rule to assess at 60 per cent. of fair cash value, and that the board of valuation and assessment had adopted and applied a rule to value at the higher rate.   And if it were otherwise proven, as, for instance, by the statement of the board itself, that it had applied such rule in the

case of a single interstate railroad company, it would be the same as if it had been proven that it uniformly valued the portions of all such railroad companies, in making out a case of intentional discrimination against such single company. As, then, the Constitution and statutes of this state require uniformity of taxation, notwithstanding they also require that it be assessed at its fair cash value, I conclude that, if the property in this state subject primarily to assessment by the county assessors was uniformly assessed for the year 1913 at less than 60 per cent. of its fair cash value, and the board of valuation and assessment in assessing plaintiff's franchise applied as to the portion of its unit in this state as the standard of valuation thereof full fair cash value, or slightly less than or about 80 per cent. thereof, it violated the Fourteenth Amendment. This conclusion is a deduction from a consideration of the Fourteenth Amendment itself. I have viewed the alleged violation thereof to determine whether it was such from the standpoint of the amendment's real meaning—above its mere letter —i. e., as if it had in so many words said, instead of that no state shall deny, that neither the legislative, executive, nor judicial departments of the state shall deny.

[6] I will now consider how the matter stands under the authorities. The relevant decisions in the order of their date are as follows, to wit: Cummings, Treas., v. Merchants' National Bank of Toledo, Ohio, 101 U. S. 158, 25 L. Ed. 903; Nashville, C. & St. L. Ry. Co. v. Taylor (C. C.) 86 Fed. 168; Taylor v. L. & N. R. R. Co., 88 Fed. 350, 31 C. C. A. 537; Louisville T. Co. v. Stone, 107 Fed. 305, 46 C. C. A. 299; New York v. Barker, 179 U. S. 279, 21 Sup. Ct. 121, 45 L. Ed. 190; Coulter v. L. & N. R. R. Co., 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615; C., B. & Q. R. R. Co. v. Babcock, 204 U. S. 585, 27 Sup. Ct. 326, 51 L. Ed. 636; Raymond v. Chicago Traction Co., 207 U. S. 20, 28 Sup. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757; Jersey City v. Central Railroad of New Jersey, 212 Fed. 76, 128 C. C. A. 532. The case of Cummings, Treas., v. Merchants' National Bank of Toledo, Ohio, and Taylor v. Louisville & Nashville Railroad Company go together. They are alike, in that in each relief was sought and granted against a discrimination in assessing property for taxation. In each, however, the ground upon which it was granted was that the discrimination was a violation of the Constitution of the state, which required uniformity of taxation, in the one case of the state of Ohio, and in the other of the state of Tennessee. In neither case was the bearing of the Fourteenth Amendment upon the discrimination considered. It may seem strange that it was not, and that more so in the Tennessee case. There the discrimination relied on was claimed in the bill to be in violation of the Fourteenth Amendment as well as of the state Constitution. Possibly it is to be accounted for by the fact that the discrimination as a violation of the amendment was not viewed from the right standpoint. But there was no real occasion for it to be considered as a violation of the amendment in either case. The federal courts, in which they originated, had jurisdiction irrespective thereof, in the one case because the plaintiff was a national bank, and in the other because of the diversity of citizenship between the par-

ties. And the fact that the discrimination was in violation of the state Constitution was sufficient to entitle plaintiff to the relief sought without reference to that amendment.

Mr. Justice Peckham, in the case of New York v. Barker, and defendants, following him, have erred in stating that the discrimination in the Bank Case was remedied because it was in violation of the act of Congress as to national banks; and I erred in my opinion in the other case in stating that the Railroad Case was based on the Fourteenth Amendment. In each case the relief granted was based on the requirement of uniform taxation by the state Constitution. The Bank Case was brought by it to enjoin the collection of a tax assessed against the shares of its stockholders, which the statute required it to pay, to the extent of the discrimination. The Constitution of Ohio not only required uniformity in taxation, but that all property be assessed at its true value in money. The statutes thereof provided for the assessment of real and personal property, except bank shares, primarily by district and ward assessors in each county, for the correction of their work by county and city boards of equalization, and for the increase or decrease of the county valuation by a state board of equalization, the increase or decrease to be no more than 12½ per cent. There was no state board that had jurisdiction over valuation of personal property, except bank shares. The provision as to the assessment of bank shares was that they should be assessed primarily by the county auditors, and that a state board of equalization, different from the one having jurisdiction of the county valuations of real property should have power to equalize the valuation thereof throughout the state as among themselves. Prior to the assessment complained of the county auditor of Lucas county, in which plaintiff was located, and the county auditors of 10 other counties in that part of the state, had held a conference, at which it was determined that a rule should be adopted and applied in their respective counties by which real and personal property, except money and invested capital, was to be assessed at one-third of its actual value, and money and invested capital at six-tenths, and the assessors and county auditor of Lucas county had met and adopted this rule for that county, and thereafter they applied it in making the assessment. Presumably this happened in each of the other ten counties. Such a rule had been adopted and applied in another county in that part of the state, and Mr. Justice Miller said probably this system of taxation prevailed over the entire state. Under this rule plaintiff and the other Toledo bank shares were assessed at six-tenths of their actual value by the county auditor of Lucas county. But the assessment returned to him by the state board of equalization placed them at their true value in money. It would seem that they had so assessed all bank shares in the state. This was the discrimination complained of, and against which relief was sought and granted. Plaintiff and all other bank shares had been assessed by the state board of equalization at their full value, and real and personal property, except money and invested capital, at least in those 12 counties, had been assessed by the assessors thereof at one-third of its value. The burden of plaintiff's complaint was that the stat-

ute providing for the state board of equalization of bank shares was in violation of the state Constitution, in that it limited its function to equalizing the valuation of bank shares as among themselves, and gave it no power to consider the valuation of real property and other personal property. But it was held otherwise, as inequality did not necessarily result therefrom. It was held, however, that the discrimination was not remediless. It was so held because of the discrimination in the rules of assessment applied by the county assessors and the state board of equalization of bank shares.

Beyond question it was an outstanding feature of the case that the application of the rule applied by the county assessors was the result first of the conference of the county auditors, and then the adoption thereof by the assessors and county auditors of the several counties. The state board had been no party to the adoption of that rule. But, though such was an outstanding feature of the case, there is no basis for claiming that it was an essential one. Had each assessor in the 12 counties, without previous conference with any other assessing official, acting for himself, adopted and applied such a rule, the result of the case could not possibly have been different from what it was. In such case the assessment of all real and personal property in the 12 counties, except money and invested capital, at one-third of its true value, of money and invested capital therein, except bank shares, at six-tenths thereof, and of bank shares therein at full value, and the resultant discrimination against the bank shares, would have been intentional. Mr. Justice Miller said:

"We are of opinion that when a rule or system of valuation is adopted by those whose duty it is to make the assessment, which is designed to operate unequally and to violate a fundamental principle of the Constitution, and when this rule is applied, not solely to one individual, but to a large class of individuals or corporations, that equity may properly interfere to restrain the operation of this unconstitutional exercise of power."

The only discrimination which the case recognizes as not being within the state Constitution and remediless is one that results from mistake of judgment and other sources of inequality which boards of equalization are designed to remedy. Still further, had nothing else appeared than that each assessor in the 12 counties had uniformly assessed the real and personal property, except money and invested capital, at one-third of its true value, and money and invested capital, except bank shares, at six-tenths thereof, and that the state board of equalization had uniformly assessed bank shares at their full value, the result could not possibly have been different. The reasonable inference would have been that this was the result of the adoption and application, separately at least, of rules to so assess such property.

It is to be noted that, without any evidence in the record bearing on the subject, Mr. Justice Miller observed that the assessment of real estate at less than its true value was not "limited to the state of Ohio, or to part of it"; that, though the Constitutions and statutes of nearly all the states require uniformity of taxation and assessment at actual value of all property subject to taxation, "it is a matter of common observation that in the valuation of real estate the rule is habitually

disregarded"; and that "it is believed that the valuation of real estate for purposes of taxation rarely exceeds half of its current salable value." He accounts for the existence of this condition of things by the effort of the landowner to produce something like equality of burden with personal property, especially invested capital, which so readily escapes taxation by removal or hiding.

The case of Taylor v. Louisville & Nashville Railroad Company was brought by the railroad company to enjoin the certification by the state board of equalization of Tennessee, whose function was to revise the assessments of the property of railroad, telegraph, and telephone companies by another state board, to the comptroller for apportionment to the several counties into and through which its railroad ran. The Constitution of Tennessee required uniform taxation, but did not require that property should be assessed at its true value in money. It merely provided that it should be taxed according to value. The statutes, however, provided that all property should be assessed at such value. The assessment of all other property than that of such companies was made by taxing officers in each county. The state board assessed plaintiff's property at its true value in money, and the taxing officers of the counties uniformly assessed all other property at not more than 75 per cent. of such value. This was the discrimination complained of, and against which relief was sought and granted. Judge Taft in his opinion noted that there was conflict in the decisions of the state courts as to the right to relieve against such a discrimination. He cited decisions of the Supreme Court of Connecticut, New Hampshire, Arkansas, Illinois, and Kansas upholding the right, and decisions of the Supreme Courts of Ohio, New Jersey, and Massachusetts against it. He might have cited, as to the same effect, the decisions of the Kentucky Court of Appeals in the case of Louisville Ry. Co. v. Commonwealth, 105 Ky. 710, 49 S. W. 486, decided about a month before, had he known of its existence. He stated, however, that the court was concluded by the decisions of the Supreme Court of the United States in the Bank Case, had its opinion been to the contrary, which it was not. Two reasons were urged why the decision in that case was not controlling. One was that in the case in hand there had been no preconcert of the county taxing officers and adoption by them of a rule of undervaluation, as in the Bank Case. In answer to this Judge Taft said:

"It has been pressed upon us that no such preconcert of action by the assessing officers, and no such uniform rule of undervaluation, have been shown in this case as appeared in the Cummings Case, and that upon these circumstances the Cummings Case turned. We have already found, from the evidence, that there is an intentional undervaluation of property in each county, and that this is uniform as to all real and personal property, and results from a clear understanding between the assessors and county boards of equalization, who have a common motive for the reduction. More than this, it is clearly shown that the state board of assessors and equalizers in 1896 intentionally equalized all real estate in the state at 75 per cent. of its true value for taxation for the year 1897. Could preconcert be clearer than this?"

The other reason was that Mr. Justice Miller, in speaking of the rule of valuation whose adoption would justify equity interfering, re-

ferred to it was one "which is designed to operate equally and to violate fundamental principles of the Constitution," and that in the case in hand it could not be said that the rule of undervaluation was so designed. In answer to this Judge Taft said:

"An intentional undervaluation of a large class of property, when the law enjoins assessment at true value, is necessarily designed to operate unequally upon other classes of property to be assessed by other taxing tribunals, who, it may be presumed, will conform to the law. In the case at bar the county assessors and board of equalization * * * have been actuated in their violations of the law by the desire to reduce, as far as may be, their county's share of the state burdens. Their undervaluations of property have been uniform as to all property in their county but railroads. They could not but know that such undervaluation must work an injustice against the property of railroads, if assessed at its true value by a state board, and taxed for county and state purposes on that basis. In this sense, the rule of undervaluations adopted in each county is necessarily 'designed to operate unequally,' within the meaning of Mr. Justice Miller in the Cummings Case. The ratio decidendi of that case is to be gathered from the facts, and the language of the opinion is to be interpreted in the view of the facts."

The determining consideration for the court's relieving against such a discrimination, as Judge Taft put it, was that it was intentional. This appears from the quotations from his opinion already made, and more fully from the following. He said:

"Before equity will relieve in such a case, it must appear that the assessing officers, whose acts of undervaluation create the unjust burden, must intentionally and habitually violate the law, by assessing property at less valuation than that which they know to be its true value."

Again:

"Equity will not relieve against an assessment merely because it happens to be at a higher rate than that of other property; that such inequalities, due to mistake, to the fallibility of human judgment, or to other accidental causes, must be borne, for the reason that absolute uniformity cannot be obtained; that, in other words, what may be called 'sporadic cases of discrimination' cannot be remedied by the chancellor. He can only interfere when it is made clear that there is, with respect to certain species of property, systematic, intentional, and unlawful undervaluations for taxation by the taxing officers, which necessarily effect an unjust discrimination against the species of property of which the complainant is an owner. The reason for the distinction is obvious. The occasional and accidental discriminations are inevitable in every assessment, and are not likely to continue, because not the result of an illegal purpose on the part of any one."

And again:

"If any board which is an essential part of the taxing system intentionally, and therefore fraudulently, violates the law, by uniformly undervaluing certain classes of property, the assessment by other boards of other classes of property at the full value, though a literal compliance with the law, makes the whole assessment, considered as one judgment, a fraud upon the fully assessed property. And this is true although the particular board assessing the complainant's property may have been wholly free from * * * fraud or intentional discrimination."

In each of these two cases the court was confronted with a dilemma. The Constitution of Ohio required both uniform taxation and assessment at the true value in money. The Constitution in Tennessee required uniform taxation, and the statutes thereof assessment at the

true value in money. The dilemma was as to which requirement would be enforced. Was the requirement as to uniformity to be enforced by leveling the higher assessment down to the lower, whereby uniformity would be secured, but no property would be assessed at its true value, or was the court to keep its hands off, whereby the assessments would be left as they had been made, so that, whilst there would be lack of uniformity, the assessments conforming to the requirement as to true value would stand? Compliance with both requirements could not be secured, because it was impossible to bring about a leveling of the lower assessments up to those of the higher. Mr. Justice Miller does not seem to have been conscious that he was confronted with such a dilemma, as he makes no reference to it. It was urged upon Judge Taft, and he deals with it. He undertook to show that, as compliance cannot be had with both requirements, the true course is to bring about compliance with the requirement as to uniformity by the leveling down process. He said:

"To enjoin the enforcement of the prescribed method of assessment as to one species of property, when there is a departure from it as to all others, if the injunction secures uniformity as to all, is not so great a violation of the method really prescribed as that involved in a continuance of the existing conditions, and the denial of relief to the injured taxpayer. The court is placed in a dilemma, from which it can only escape by taking that path which, while it involves a nominal departure from the letter of the law, does injury to no one, and secures that uniformity of tax burden which was the sole end of the Constitution. To hold otherwise is to make the restrictions of the Constitution instruments for defeating the very purpose they were intended to subserve. It is to stick in the bark, and to be blind to the substance of things. It is to sacrifice justice to its incident."

In neither case had the Supreme Court of the state taken position upon the question there involved. Whether, if it had, and the position was adverse to the right to relief against the discrimination, as the Court of Appeals of this State has done in such a case, it would have made any difference in the decisions, cannot be told from anything said in the opinions. Though this case, in view of this decision of the Kentucky Court of Appeals, has a feature in it that did not exist in either of these two, here the complaint against the discrimination is based on the Fourteenth Amendment, and not on the state Constitution, as there. If it so be that this complaint, therefore, has foundation in fact, this feature of the case, instead of being an obstruction to granting the relief sought, is an aggravation of the discrimination, and renders the granting of the relief more imperative, if that were possible. The Fourteenth Amendment only requires equality of treatment in the enforcement of the tax laws of states forbidding discrimination. It has nothing to say on the subject of assessing property at its true value. This makes it so that this court is not confronted with the dilemma which confronted the courts in the Ohio and Tennessee cases, where the complaint against the discrimination was based on the state Constitution, which in the one case required that property should be assessed at its true value, as well as that taxation should be uniform, and in the other, together with the statute, so required. What we have here, then, in that contingency, is an intentional discrimination, and the highest

court of the state holding that it is powerless to remedy it in the only possible way in which it can be remedied, notwithstanding it is as much its duty as this court's to enforce the Fourteenth Amendment, the supreme law of the land.

The next of the relevant decisions to be considered are those in the cases of Nashville, C. & St. L. Ry. Co. v. Taylor and Raymond v. Chicago Union Traction Company. They go together. They are alike, in that in each case relief was sought and granted against a discrimination in assessing property for taxation similar to that complained of herein. The first one, as did the case of Taylor v. L. & N. Ry. Co., arose in Tennessee. The other arose in Illinois. The Constitution of that state does not require uniformity as to the members of each class. In that case the discrimination complained of was amongst the members of the class to which the traction company belonged. In each of these two cases the right to the relief sought was based solely on the ground that the discrimination complained of was a violation of the Fourteenth Amendment, and the claim that it was was the sole basis of federal jurisdiction. In neither was there diversity of citizenship, or other ground of federal jurisdiction than this. The Supreme Court of the United States in the Traction Company Case cited and approved the decision in the Railway Company Case, a decision of the Circuit Court. Though the decision of an inferior court, it has behind it the Supreme Court. These two decisions are on all fours with the case in hand, and uphold the position which I have been led to take. An attempt is made to distinguish the Traction Company Case, on the ground that there the assessment complained of had been directed to be made by the Supreme Court of the state. There is nothing in this to call for a difference in decision. Besides, though the assessment complained of here was not made by direction of the Court of Appeals of Kentucky, it has held that it is powerless to relieve against it. Mr. Justice Peckham, in the Traction Company Case, thus expressed himself as to what is essential to bring a discrimination of the kind involved here within the amendment:

"A system of valuation was adopted and applied to a large class of corporations, differing wholly from that applied to other corporations of the same class, and resulting in a discrimination against the appellee of the most serious and material nature. It is not a question of mere difference of opinion as to the valuation of property, but it is a question of difference of method in the manner of assessing property of the same kind. Although the law itself may be valid, and provide for a proper valuation, yet if, through mistake on the part of the state, through its board of equalization and while acting as a quasi judicial body, the board erred in the method to be pursued in relation to the corporations now before us, the mistake is one which may be corrected in equity."

Then came the decisions in Louisville Trust Co. v. Stone, Coulter v. L. & N. R. R. Co., and C., B. & Q. R. R. Co. v. Babcock. They go together. They are alike, in that in each relief was sought against a discrimination in assessing property for taxation, similar to the one complained of herein, but it was denied. The first two arose in Kentucky, and that after the adoption of the present Constitution of the state. The last one arose in Nebraska. The Constitution of that state re-

quired uniformity of taxation. The sole ground upon which relief was sought against the discrimination was that it was in violation of the Fourteenth Amendment. Certainly in the first two, and not unlikely in the last one, the claim that it was was the sole basis of federal jurisdiction. The decisions in the first two cases, being Kentucky cases, may be thought to be of more significance here than any of the other relevant decisions cited. The ground upon which, in each of the cases, the relief sought was denied, was solely that the alleged discrimination had not been established by the evidence. In the case of Louisville Trust Company v. Stone it was more clearly recognized than in the other two that it came within the Fourteenth Amendment. Judge Day, now Mr. Justice Day, thus expressed himself on the subject:

"It may be conceded that, if the allegations of the bill are made out, there exists in respect to the property of complainant, and others similarly situated, a systematic, intentional, and illegal undervaluation of other property by the taxing officers of the state, which necessarily effects an unjust discrimination against the property of which the plaintiff is the owner, and a bill in equity will lie to restrain such illegal discrimination, and that in such cases federal jurisdiction will arise because of the equal protection of the laws guaranteed by the Fourteenth Amendment."

Because of the position thus clearly expressed this case was also cited and approved by the Supreme Court in the Traction Company Case as in accord with the decision there rendered. By reason thereof the Supreme Court may be looked to as an authority in support of the position that the law as thereby expressed is applicable to this state in a proper case.

The opinions in the other two cases were written by Mr. Justice Holmes. If one may be justified in taking them as reflecting to a certain extent his own individual views, apart from those of the court itself, he cannot avoid thinking that Mr. Justice Holmes, at least, doubted whether such a discrimination as is alleged here was within the Fourteenth Amendment, and his dissent in the Traction Company Case, which followed shortly afterwards, would indicate that he thought that it was not. Certainly, in describing what was essential to bring such a discrimination within the amendment, he used terms which had not theretofore been used, and which were not repeated in the Traction Company Case. In the case of Coulter v. L. & N. R. R. Co., in referring to the undervaluation of property generally, constituting "one-half" of plaintiff's case, he said:

"It is not contended that a mere undervaluation would be enough. It is admitted that it must have been systematic and intentional."

Here the language used is familiar. But further on in the course of the opinion he said:

"Inequality, we repeat, is nothing, unless it was in pursuance of a scheme."

Just what he meant by "in pursuance of a scheme" is not certain. As, however, what is here stated is put as the repetition of a thought theretofore expressed, it may be that he meant no more than what he had already intimated; i. e., that the inequality must have been brought about by a "systematic and intentional" undervaluation of such prop-

erty. But in the case of C., B. & Q. R. R. Co. v. Babcock he went further, and coupled the word "agreement" with "scheme." He there said:

"A point less pressed than the foregoing was that the other property in the state was greatly undervalued, and that thus the rule of uniformity prescribed by the Constitution of Nebraska had been violated. Upon this matter it is enough to say that no scheme or agreement on the part of the county assessors, who taxed the other property, was shown, or on the part of the board of equalization and assessment."

If he meant by this language that something more than what I have heretofore pointed out was essential to bring such a discrimination as is relied on here within the amendment, I respectfully submit that the position is not justified, either by reason or the authorities. And I cannot avoid the notion that his ideas on the subject were somewhat confused. I alluded to one of the indications of this in my opinion in the other case. He took note of the fact that the legislative department, in the exercise of its function of enactment of laws of taxation, is not held to a rigid equality, but may make reasonable discriminations, citing the authorities to that effect, seemingly as justifying the conclusion reached in that case. I would submit that this position has no relevancy whatever to the question whether the executive department of the state, where uniformity of taxation is required, in exercising its function of enforcing the tax laws of the state by assessing the property subject to taxation, may make a discrimination, and, if so, what discrimination it may make, which was the question involved in that case. Still further, he seems to have thought that a court having before it the question whether such a discrimination as is alleged here is a violation of the Fourteenth Amendment—which was the question he had there—is confronted with the dilemma which was put up to Judge Taft in the case of Taylor v. L. & N. R. R. Co., and which he considered and disposed of. He said:

"The railroad company contends that, when there is a uniform and general undervaluation of other property, then the only way in which the company can be put on an equality with other taxpayers is by a similar undervaluation in its case. The railroad company contends further that, although this contravenes the letter of the statute, the requirement of equality so far outweighs the requirement of a tax on the full value of property that, if by misconduct elsewhere both cannot be observed, the rule of equality must prevail."

And again:

"We may assume for purposes of decision, without deciding, that if we otherwise agreed with the railroad company's contention the injunction might be granted, although the franchise was valued as the law requires in every respect, except in the proportion which the assessment bore to the other valuations. The decisions are not agreed upon this point."

Now I would submit here that, though a court dealing with the question as to whether such a discrimination as is alleged here can be relieved against, when it is considered solely as a violation of the state Constitution, which also requires that property shall be assessed at its full value, as was the case in Cummings, Treas., v. Merchants' National Bank of Toledo, Ohio, and in Taylor v. L. & N. R. R. Co.,

is confronted with such a dilemma, a court dealing with the question whether it can be relieved against as a violation of the Fourteenth Amendment, which has no requirement as to how property shall be assessed for taxation, but merely requires that there shall be no denial of the equal protection of the laws, is not confronted therewith. Besides these matters, Mr. Justice Holmes' dissent in the case of Raymond v. Chicago Union Traction Company seems to indicate that he viewed alleged violations of the Fourteenth Amendment from the standpoint of the letter thereof, and not from that of its real meaning, as I have claimed it to be. His position was that the doctrine of the case of Barney v. New York should be perpetuated, notwithstanding that it was open to the criticism which I ventured in my former opinion (209 Fed. 446 et seq.), which doctrine was subsequently condemned in the case of Home T. & T. Co. v. Los Angeles.

There are but two other of the relevant decisions cited above to be considered. Each stands by itself. That in the case of New York v. Barker is of consequence merely because therein the Supreme Court assumed the position here taken to be sound. It involved the question whether the legislative department of the state had denied the corporations thereof the equal protection of the laws, in that a certain statute enacted by it afforded an opportunity for discrimination. It was held that it had not. Having thus decided, the court proceeded to consider whether a case was made out of such a denial by the assessing department of the state in enforcing its tax laws. It assumed that such a denial could be, but held that it had not been, made out. An indication of what was thought would be such a denial may be gathered from these words of Mr. Justice Peckham, to wit:

"To raise the question which the plaintiff in error seeks, it was therefore obviously necessary to allege and prove as a fact that there was habitual violation of law by undervaluation."

According to this all that was necessary to make out a case was proof that plaintiff's property had been assessed at its full value and that in case of other property there was "habitual" undervaluation. The case modifies somewhat Mr. Justice Miller's statements in the Bank Case, tending to support the position that the court will take judicial notice of uniform undervaluation of real estate. It holds that it will not, and that it is a matter of proof like any other fact. The defendants cite this case as bearing on this point, but are unwilling to accept its assumption.

As to the decision in the case of Jersey City v. Central Railroad of New Jersey—a decision of the appellate court of the third circuit—it is not important to make further reference to it than to state that it was held therein that such a discrimination as is alleged here is contrary to the Fourteenth Amendment.

The result of this survey of the relevant decisions is to make good the position which I have deduced from a consideration of the Fourteenth Amendment by itself, and which I took in the other case. Those who want to may contend otherwise, but in so doing they will be butting their heads against a stone wall. And just here I would change

a position taken in the other case (209 Fed. 455). It is that it was the assessing officers, who had to do with the assessment of property subject to assessment by the county assessors, and not the board of valuation and assessment, which had denied plaintiff the equal protection of the laws, if the discrimination charged was made. I would take that back. Undoubtedly those assessing officers, in not assessing such property at its fair cash value, breached their duties, and thereby made it so that, if a higher standard of valuation was used in assessing plaintiff's property by the board of valuation and assessment, an injustice would be done it. Had they done their duty, less taxes would be required, which would call for a reduction in the rate of taxation, which, if made, would cause plaintiff to pay less on a valuation of its property at fair cash value. But it was not they who denied plaintiff the equal protection of the laws. It was the board of valuation and assessment. It had no right to value plaintiff's property at a higher rate than that at which it was reasonable for it, with the evidence before it, to believe such other property was assessed. There was nothing in the oaths which its members took to require that it should so value it. The federal Constitution is the supreme law of the land, and they, as well as all other persons within its jurisdiction, owed obedience thereto over and above everything else. And that it assessed the capital of banks at 80 per cent. of par value would seem to indicate that it did not think that it was imperative on it to assess plaintiff at any higher rate.

What, then, is the fact as to whether there was an intentional discrimination against plaintiff in the assessment for 1913? In determining what is the fact in regard thereto, there can be no question that the board, in valuing the portion of plaintiff's unit in this state, consciously adopted and applied the standard of at least slightly less than or about 80 per cent. of fair cash value, in placing it at the sum of $75,139,074—that of full fair cash value being the standard in placing it at $94,500,000—and possibly the standard of full fair cash value in placing it at the lesser sum. Which it was depends on the true construction of its minute. It was one or the other. How, then, is it as to the other half of the case which it is essential that it be established to make out the discrimination alleged, and one which comes within the amendment? At the outset of this litigation it seemed to be conceded that the property subject to assessment by the county assessor was uniformly undervalued and that to a substantial degree. This led me in the other case (209 Fed. 460) to say:

"Progress, therefore, has been made along the line of truthfulness since 1902. No longer do the courts have to contend with the sham and pretense that ordinary property in this state is assessed at its fair cash value, or substantially so."

But it seems that such is not now the case. The defendants have denied the allegations of the bill to this effect, and insist that these allegations have not been established by the evidence. The plaintiff, on the other hand, contends that there was no occasion to so establish them, as the court takes judicial notice of the truth of those allegations. It cites in support of this position the following decisions, to wit:

Cummings, Treas., v. Merchants' National Bank of Toledo, Ohio, 101 U. S. 162, 25 L. Ed. 903; Railroad & Telephone Cos. v. Board of Equalizers (C. C.) 85 Fed. 308; Wray v. Knoxville, etc., R. R. Co., 113 Tenn. 544, 82 S. W. 471; Miller v. Windsor Water Co., 148 Pa. 529, 23 Atl. 1132. It thinks that I committed myself to this position in the other case when I said, in referring to the case of Coulter v. L. & N. R. R. Co., supra (209 Fed. 457):

"I confined myself in that case entirely to reasoning from the facts in evidence. I might have been justified in saying then, as now, that it is a matter of common knowledge to any one living in this state with a reasonable acquaintance with its affairs that such is the case."

But I did not mean thereby to so commit myself. And the decision of the Supreme Court of the United States in the case of New York v. Barker, where what Mr. Justice Miller had to say in the Bank Case was qualified, would seem to be against it. Possibly the true position is that judicial notice will be taken of the fact that such property is uniformly undervalued for assessment purposes, but not of the extent of the undervaluation. This must be established by evidence. In Coulter v. L. & N. R. R. Co. Mr. Justice Holmes said:

"There is, no doubt, a natural inclination to think such an undervaluation probable when it is suggested."

I will therefore determine the question under the evidence. Evidence was available, but not presented, which it seems to me would have settled beyond question the truth, not only as to the fact of undervaluation, but as to the true percentage thereof. The Constitution and statutes of this state prescribe as a test of the fair cash value of property therein the price which it will bring at a fair voluntary sale. The Constitution of Illinois, quoted in Raymond v. Chicago Union Traction Company, prescribes the same test. The statute of New York, quoted in New York v. Barker, prescribes as the test of the full and true value of property what it would be appraised at in payment of a just debt from a solvent debtor. Now both of these tests are to a certain extent uncertain. Is the price which a given piece of property will bring at a fair voluntary sale the test, or what will it be appraised at when taken in payment of a just debt from solvent debtor? Fair-minded and reasonable men will differ as to this. But in case of real estate which has been sold at a fair voluntary sale the test of what it will sell for is no longer needed. The price at which it actually sold fixes its fair cash value, in the absence at least of any exceptional circumstances, and that price should appear from the record of the deed of conveyance. If, then, as to such property, its assessed value is compared with its fair cash value, as thus fixed, it can be determined at once with certainty whether it was assessed at its fair cash value, and, if not, the percentage thereof at which it was assessed. By taking into consideration all such property which has been sold in a given county during the year, the average percentage at which it was assessed can be obtained. It is a fair inference therefrom that the real estate which was not sold during the year was assessed at the same average percentage of its fair cash value, and that personal property was as-

sessed at no greater percentage. It is this evidence, to wit, evidence of the percentage at which all real estate which was sold in each of the counties of the state during the year 1913 was assessed, to which I refer.

Two hindrances no doubt existed in the way of this evidence being effective. One hindrance is this: Tabulated statements are required by statute to be furnished each year to the board of equalization by the county clerks of the sales of real estate during the year, the consideration therefor named in the deeds, and the assessed values thereof, in order that it may have such evidence as it furnishes of the percentage of cash value at which property in each county is assessed. To prevent the state board from increasing the assessments of the counties by reason of the showing made under these statements, it is the practice of the county assessors, as to which there is abundant evidence in this record, to assess the property sold during the year at a much higher percentage of its value than it had been theretofore and would be thereafter assessed. This hindrance could have been met by evidence as to the amounts at which the property sold had been assessed the preceding and succeeding years to that in which it was sold. The other hindrance is connected with the other term of the comparison, to wit, the consideration for which the sale was made. In many instances, no doubt, the conveyances would not disclose the true consideration, and this for the purpose of preventing a raise in the assessment. This hindrance could have been met by the testimony of the parties to such conveyances as to true consideration. To have presented this evidence in full would have necessitated the expenditure of much time, labor, and money; but the amount involved in this and its companion cases would have justified the expenditure. Saul lost his kingdom for want of thoroughness. He would save Agag and the choicest stock. And if the Germans do not save theirs it will not be for the want of this great quality. I do not overlook the fact that in the case of Coulter v. L. & N. R. R. Co. Mr. Justice Holmes seems to belittle the showing made by the tabulated statements furnished by the county clerks to the state board of equalization as bearing on the fact of undervaluation and the extent of it. He there said:

"It is obvious that the accidental sales in a given year may be a misleading guide to average values, apart from the testimony that some at least of the conveyances did not report true prices, yet they furnish the chief weapon of attack."

It is true that in one direction they were a "misleading guide," and the fact that all conveyances did not report true prices was against their effectiveness. But the direction in which these two considerations affected the value of this evidence was not to prevent the statements showing that the percentage of assessment to fair cash value was really greater than shown thereby, but to prevent them showing that it was really much less. It could be relied on without the slightest hesitation that the percentage was not greater than that, but that it was much less. These two weaknesses in the showing made by the comparison of the prices for which the real estate sold and the assessments thereof would be removed by the evidence to which I have al-

luded, to wit, of the assessments for the preceding and succeeding years and the testimony of the parties to the conveyances. With these weaknesses removed, such a comparison would give a definite and certain percentage of assessment to fair cash value. It is not possible to obtain a definite and certain percentage in any other way. A boom or a depression in a given year may make the comparison misleading for that year, so that some allowance would have to be made for this. But for years in this state there has been no such disturbing cause. The value of such a comparison in determining the percentage of assessment to fair cash value was recognized by the Legislature of Kentucky, in that it provided that the tabulated statements, notwithstanding the two weaknesses referred to, which worked against the state, should be prima facie evidence of the true percentage. And the present Constitution would seem to have had them in mind when it for the first time in this state prescribed the prices at which property would sell at fair voluntary sale as the test of its fair cash value.

Coming, then, to the evidence which has been introduced, what do we find? Several considerations which I made much of in the case of L. & N. R. R. Co. v. Coulter, my opinion in which is reported in 131 Fed. 282, I think can be availed of here. Down at least to the year 1906 there was legislative recognition of the fact that property generally in this state was not assessed at exceeding 70 per cent. of its fair cash value. In the opinion referred to I gave a historical survey of the legislation in Kentucky as to the assessment of property for taxation. It appears therefrom that down to 1886 the provision was that property should be assessed at its fair and full value, and then for the first time it was provided that it should be assessed at its fair cash value. In 1831 it was provided that the taxpayer should make oath to the value of his property. But this requirement did not remain long in force. It was repealed in 1838. And as I read the statutes it was not again required until 1886, when it was first prescribed that property should be assessed at its fair cash value. It was required, at the same time, that the assessors before beginning their work should make oath that they would assess, and again, after they finished their work and before they could receive their pay, that they had assessed, the property subject to assessment by them at its fair cash value, and that the members of the county boards of supervisors, before beginning their work, should make oath that in each instance where property had not been assessed at its fair cash value they would make the assessment conform thereto. No such oaths on the part of the assessors and members of the county boards of supervisors had theretofore been required. They had merely been required to make oath before beginning the performance of their duties that they would faithfully perform them. Why the necessity of this stringent legislation? How is it to be accounted for? It is not to be accounted for save on the ground that property in the state was not being satisfactorily assessed, and something stringent was needed to bring about a satisfactory assessment. This stringent legislation is a witness to this much at least. That such a condition of things existed is also witnessed about this time by the Court of Appeals of the state in the case of Spalding v.

Hill, 86 Ky. 656, 7 S. W. 27, decided February 11, 1888, just shortly after the state board of equalization was first created. Judge Bennett there said:

"It is the settled doctrine of this state that, for the purpose of taxation, property must be assessed according to its true value; * * * that equality of burden is essential to the correct administration of the government. But it is a fact, known by all, that for years past the grossest inequalities have existed in the value fixed upon all kinds of property by the county assessors, and that the county boards of supervisors have failed to correct the evil. In some counties it is said that assessors secure their election by pledges made to assess the property in the county, or certain kinds of it, at a low value. In creating the state board of equalization, the object was to correct this evil, and to have the assessment of taxes in the several counties equalized according to the value * * * therein, so that the state government might be supported by just and equal taxation."

Possibly this stringent legislation witnessed also a desire that property should be, and an expectation that by reason thereof it would be, assessed at its fair cash value. But the evidence is clear that, however it may have been as to the desire there was no expectation whatever that it would have any such effect. By the act of May 4, 1888, with these stringent provisions in the statutes, it was provided right alongside of them that the state board of equalization should. adopt 69 per cent. of fair cash value as the standard to which the county assessments were to be made to conform, and in order that it might be in a position to know how far the assessments conformed to this standard it was for the first time provided that the county clerks should furnish the tabulated statements heretofore referred to. As stated, it was provided that they should be accepted as prima facie evidence of the percentage of fair cash value at which the assessments were made, provision being also made for hearing witnesses. By the act of May 27, 1890, the percentage was changed from 69 to 70. The effect of this legislation is to show that the expectation as to the stringent legislation referred to could have been no more than that the effect thereof would be to raise the assessments to as much as 70 per cent. Such was the condition of things at the time of the adoption of the present Constitution, which incorporated into it the requirement that property should be assessed at its fair cash value. Mr. Justice Holmes in the case of Coulter v. L. & N. R. R. Co., seems to have thought that the legislative recognition that property in this state was assessed at not more than 70 per cent. of its fair cash value was confined to the time before the adoption of the Constitution. He said:

"The state Constitution, whatever the statutes may have said, seems popularly to have been understood to have made a great change in the law. Practice before its adoption, therefore, hardly can raise a presumption as to practice afterwards, even on the liberal assumption that it properly could be considered in evidence."

Beyond question the Constitution made a great change in the law. Thereafter the Legislature could not, as before, prescribe anything less than fair cash value as the standard of assessment. There must have been something in the record, not appearing in the opinion, to justify the statement that it seems to have been popularly understood that the

Constitution had that effect; and it may be accepted that there was no presumption that practice before the Constitution continued afterwards. I cannot see, however, why it was a liberal assumption that former practice could be considered in evidence at all. One of the recognized methods of criticism in determining the truth of things is to consider them genetically. And it would seem not to require much evidence to convince one that the mere adoption of the constitutional provision did not have effect of changing the settled habit of the people of the state as to the assessment of property for taxation. From the beginning the statutes of the state had prescribed that property should be assessed at its fair and full value. This legislation was binding on the taxpayers thereof as much as the constitutional provision. The Legislature, in providing that the state board of equalization should equalize the assessments of the several counties on the basis of 70 per cent. of its fair cash value, indicated that it did not think that the requirement as to so much oath taking would increase the assessment beyond 70 per cent. of its fair cash value. In view of these considerations, is not the case quite weak for thinking that the mere embodiment of the requirement that property in the state should be assessed at its fair cash value would affect any material increase in the rate at which it was assessed?

But the legislative recognition that property in this state was assessed at no more than 70 per cent. of its fair cash value is not limited to the time before the adoption of the Constitution. The effect of the constitutional provision, of course, was to repeal the statutory provision as to equalizing the assessments on such basis. Immediately after the adoption of the Constitution, and because thereof, a long session of the Legislature was held, lasting nearly a year, to make the statutes of the state conform thereto. Most of them, with certain modification, were re-enacted. Amongst other statutes then enacted was a comprehensive one on the subject of "Revenue and Taxation," which went into force November 11, 1892. It contained the stringent provisions of the preceding legislation as to oath taking by the taxpayers, county assessors, and members of the county boards of supervisors, with the additional requirement that that of the taxpayer should be in writing and signed by him. This statute covered the entire subject, except in one particular. It omitted anything as to the state board of equalization. It left that matter to be still covered by the preceding legislation, which contained the requirement that the board should equalize the assessments of the various counties at 70 per cent. of fair cash value. Why the omission? Of course, one cannot tell for certain what was the reason thereof. Could it have been that, that Legislature's special function being to make the statutes of the state conform to the new Constitution, it could not see its way clear to provide that the state board of equalization should equalize on the basis of 70 per cent. of fair cash value, and yet it was not ready to provide that it should do so on the basis of fair cash value, either because it was not desired that it should do so, or it was thought to be useless to require it to do so? But so it was that it left this legislation unaffected by any act on its part.

Matters continued in this condition until the act of March 29, 1902. The special function of the Legislature which enacted it was not to make the statutes conform to the Constitution, and it was 10 years away from its adoption. That act also was a comprehensive one on the subject of "Revenue and Taxation." It covered the whole of it. It re-enacted the stringent provisions of the former act as to oath taking, and right alongside of it the legislation as to the state board of equalization in existence before the adoption of the new Constitution, with its provisions that that board should equalize the county assessments on the basis of 70 per cent. of fair cash value. This act remained in force until March 16, 1906, when another comprehensive act on the subject was passed, which is still in force. This was the first Legislature after the termination of the litigation in Coulter v. L. & N. R. R. Co., and then for the first time this requirement as to equalizing on such basis was changed, and that in awkward fashion (section 4274, Ky. Stat.), so as to require the equalization on the basis of fair cash value. The effect of this legislative recognition is not only to support the position that the assessments for 1913 could not have been for more than 70 per cent. of fair cash value, but to knock the props from under the only consideration appealed to by defendants to support the position that they were for as much as full fair cash value. That consideration is that, in view of the requirements as to so much oath taking in connection with the making of the assessments, it is to be presumed that they were at full fair cash value. No such presumption can be indulged in, in the face of the fact that right alongside of these requirements there existed for 20 years the legislative provision that the state board of equalization should equalize the assessments of the various counties on the basis of 70 per cent. of fair cash value.

Again, the comparisons which I made between the total assessments for the year 1902 and those previous to the adoption of the Constitution, and the showing made by the tabulated statements, which I took great pains to demonstrate, are not without some force here. There had been but little increase in those assessments in that time. And, doctored as those statements had been, they evidenced that property in the state had not been assessed at more than 80 per cent. of fair cash value. I have heretofore noted that Mr. Justice Holmes indicated that he was impressed by the force of my reasoning to the effect that property generally in the state was uniformly undervalued, and that substantially so. But, of course, if there was nothing more here than what was in that case, I could not, in the face of the decision of the Supreme Court in that case, take any such position here. The case in hand is not limited thereto. It contains much more than this in support of that position. I will simply enumerate the additional evidence, without elaborating on any item.

1. The United States census for the year 1910. In my opinion in the other case I noted that according to it the assessed value of farm property in this state, consisting of land, buildings, machinery, implements, and live stock, was 51.6 per cent. of the cash value. According to that of 1900, the percentage was 63, indicating that in the decade there had been an increase in the cash value, with no corresponding

increase in the assessed value. From a comparison of certain details of the census of 1910 with the report of the state board of equalization for the year 1913 as to the same details we have this result: The census gives the value of farm lands, with improvements, as $635,459,372; the report gives the assessed value thereof as $355,285,669. The assessed value thereof for 1913 was 55.9 per cent. of its true value in 1910, three years before. The census gives the value of live stock as $117,486,662; the report gives the assessed value as $57,318,478, or 48.8 per cent. of the true value thereof three years before. The census gives the value of agricultural implements and vehicles of all kinds as $20,851,846; the report gives the assessed value thereof as $8,921,889, or 42.8 per cent. of the true value, thereof three years before. The Report of Wealth, Debt, and Taxation issued by the Census Bureau in 1907 states that farm lands and improvements in this state constituted 52.872 per cent. of the value of all taxed real property and improvements. If this be accepted as the correct percentage, and the valuation of farm lands and implements given by the census for 1910 as the true value thereof, then the true value of all taxed property and improvements for that year was $1,201,822,607. The report of the state board of equalization for the year 1913 gives the assessed values thereof as $647,603,715, or 53.882 per cent. of the true value of the whole three years before.

2. The report of the state board of equalization to the Governor for the years 1910, 1911, 1912, and 1913. I quoted certain portions of the reports for the years 1910 and 1911 in my former opinion (209 Fed. 458, 459). They are all illuminating of true conditions in this state as to the matter of assessing property for taxation. The report of 1911 shows a real effort on the part of the board for the years 1910 and 1911 to raise the assessments. It raised the assessments in 1911 more than $22,000,000 over what they were the year before. The succeeding boards for 1912 and 1913 fell back in 1912 a little under $6,000,000, and went ahead of the assessment for 1911 about the same amount in 1913.

3. The report of the state tax commission, appointed under a joint resolution adopted by the Legislature and approved March 15, 1912, to that body made in December, 1913, after having been at work for nearly two years. The commission stated that the average ratio of assessed value to true value of farm lands throughout the state was about 52 per cent., and further that "no pains had been spared to ascertain the correct figure." Evidently the commission accepted the census of 1910 as the basis of its work and verified it. It found, not only the average ratio for the state, but the ratio for each county. There were at that time 119 counties in the state. It found that in all of them the ratio was between 30 and 40 per cent.; in 38 between 40 and 50 per cent.; in 44 between 50 and 60 per cent.; in 13 between 60 and 65 per cent., most of them nearer 60 than 65 per cent.; in 3 between 65 and 70 per cent.; in 6 between 70 and 75 per cent., most of them nearer 70 per cent. than 75 per cent.; in 3 between 75 and 80 per cent.; and in one 80.6 per cent.

4. The testimony of John E. Garner, a member of the state board

of equalization for the years 1908, 1909, 1910, and 1911, and its chairman and author of its reports for the years 1910 and 1911. His testimony was that the practice of the assessors was to assess real estate—lands and town lots—at from 40 to 50 per cent. of fair cash value; that as to personal property it "was more a matter of escaping taxation than paying taxes"; and that the board endeavored to raise the assessment to approximately 60 per cent. of its value.

5. The affidavits of about 190 individuals, men of affairs, from 47 counties in different parts of the state. They place the percentage of assessed value to fair cash value in their respective counties mainly at 60 per cent. Some of them place it lower than 60 per cent. and some as low as 15 per cent. As to only one county is the percentage placed higher than 60 per cent., and in that instance the percentage is placed at from 60 to 70.

6. The action of the board of valuation and assessment in assessing the banking capital of the state. It assessed it at 80 per cent. of par value, which not unlikely is not more than 60 per cent. of fair cash value. This action shows, not only that the board discriminated in its own work, assessing plaintiff at slightly less than or about 80 per cent. of possible full fair cash value, and the banks at 80 per cent. of par value, but tends to establish undervaluation claimed to exist of the property subject to assessment by the county assessors. This assessment cannot be accounted for on any other ground than that it was thought that banking capital should not be assessed at a higher percentage than such property is.

7. The action of the Attorney General of the state in filing before the board of valuation and assessment, when considering the assessment question herein, affidavits of certain individuals from eight different counties of the state, including the counties of Jefferson, Kenton, and Fayette, in which are located the cities of Louisville, Covington, and Lexington, the assessment of which counties cover more than one-third of the total assessed value of property in the state subject to assessment by the county assessors; and those affidavits were to the effect that property in those counties was assessed at 80 per cent. of its fair cash value. I am not now concerned with the question as to the percentage at which such property was undervalued, but with the question whether it is uniformly undervalued to a substantial degree. This item of evidence is to the effect that it was undervalued at least to the extent of 80 per cent.

Now as against this evidence the defendants have not introduced one particle of conflicting evidence. The only evidence which they have introduced consists of the affidavits of ex-county assessors for the years 1910, 1911, 1912, and 1913 from over 90 counties. With three exceptions they are of a stereotyped character. All but one were evidently prepared by some one acting on behalf of defendants, and distributed to be signed and sworn to by ex-county assessors of the state for those years. In all but the three each affiant states that he endeavored to follow the law and assess all property at its fair cash value, estimated at the price which it would bring at a fair voluntary sale; that if any property was assessed at less than such fair cash

value it was unintentional on his part; that never at any time had he entered into any agreement or understanding with any other officer in the state whose duty it was to assess property for taxation, or any one else, that property should be assessed at less than its fair cash value estimated at the price it would bring at a fair voluntary sale, and that he never heard of any such understanding or agreement; and that no property was ever intentionally assessed by him for less than such fair cash value, and, if he so assessed any property, it was on account of mistake or lack of proper evidence as to its value. In none of them did the affiants negative the fact that the property assessed by them had been uniformly undervalued.

The absence of any evidence of this character from this case is striking when we come to compare it with the other cases in which the question of uniform undervaluation in this state has been involved. As has been seen, there are two of such other cases, to wit, Louisville Trust Co. v. Stone and Coulter v. L. & N. R. R. Co. In Louisville Trust Co. v. Stone the evidence to the effect that property was assessed at its fair cash value was quite formidable, as will be seen from Judge Day's opinion therein. The affidavits of 95 county assessors, 114 county clerks, 4 members of the board of equalization, and the chief secretary of the board were to the effect that the property in the state was so assessed. In Coulter v. L. & N. R. R. Co. the evidence to this effect was less formidable; and in this case there is an entire absence of any such evidence. This indicates that the fact of uniform undervaluation to a substantial degree has become so bald and patent that no one can now be found that will swear to the contrary. Those who would perpetuate the sham and pretense that property generally in this state is not uniformly and intentionally undervalued to a substantial degree, and would have the courts sanction its perpetuation, have withdrawn entirely from the objective field, save in the particular as to the existence of an agreement amongst the county assessors, which no one claims, and entered the subjective, where it may be thought that it is more difficult to determine the truth.

The evidence in the case, therefore, seems to be sufficient to convince any one of the truth of plaintiff's claim that the property in this state subject to assessment by the county assessors for the year 1913 was uniformly undervalued to a substantial degree. It is equally convincing that such undervaluation was intentional on the part of the ex-county assessors, notwithstanding the affidavits to the contrary. It was hardly to be expected that they would admit that they had intentionally undervalued the property assessed by them, and had not endeavored to assess it at its fair cash value, thereby acknowledging of record that they had violated their oaths. Nor would I say that in stating that they had not intentionally undervalued, and had endeavored to assess at fair cash value, they deliberately swore to that which they knew to be untrue, though it is quite difficult to see how, if they reflected on the matter, they could persuade themselves that they were speaking the truth. It is likely that none of them duly reflected upon the full effect of what they were swearing to, and that, in so far as they reflected at all, they in some way persuaded them-

selves that in some sense it was true, or at least not false. The fact of uniform undervaluation is so overwhelmingly established and to such a marked degree that it would be a reflection on one's capacity to see things as they are not to hold that the undervaluation was intentional. The real truth crops out from this quarter. One of the ex-county assessors to whom the stereotyped form of affidavit was sent came from Warren county. He interlined it so as to make it state that he endeavored to assess property at about 70 per cent. of its fair cash value, that if any one was assessed at less than 70 per cent. of its fair cash value it was unintentional, and that no property was ever intentionally assessed by him for less than 70 per cent. of its fair cash value. Another was the ex-county assessor of Carroll county. He put it in the waste basket and prepared an affidavit for himself. In it he stated that he assessed all real estate that was on the transfer sheet—that is, all that had been sold during the year just previous to the assessment—at 80 per cent., of its purchase price as shown by the records, and all other property was listed by the owner or agent under the oath prescribed by law. And still another was the ex-county assessor of McCracken county. He added thereto the statement that he tried to value all property fairly and equitably, and that in some instances property was assessed at less than he thought was its fair cash value, but he let it stand because it was assessed in his opinion as other property in the same neighborhood.

This leaves nothing to be determined but the percentage of fair cash value at which such property is uniformly assessed; and as to this I see no escaping the conclusion that it is not assessed at more than 60 per cent. thereof.

It remains to determine the effect of the conclusion that, in the making of the assessment for 1913 of plaintiff's franchise, there was an intentional discrimination against it within the Fourteenth Amendment, in connection with those heretofore reached, upon the relief, if any, which the plaintiff is entitled to herein. We have seen that, assuming $262,252,566 to be the true cash value of plaintiff's unit, as the board found it to be, 24.9601 to be the true percentage of the fair cash value of plaintiff's unit to be apportioned to Kentucky, and the portion of Kentucky's unit therein not to be of greater value than the mileage proportion of the value of the unit, the latter two of which assumptions I have held to be correct, the fair cash value of the portion of plaintiff's unit in Kentucky was $64,750,418.79. Sixty per cent. thereof is $38,850,251.12. Deducting therefrom $29,500,772, the assessed value of the tangible property, leaves $11,349,479.27 as the value of the franchise, which is about the amount of the assessment for 1911, and less than half of the amount on which payment has been made. But, if $262,252,566 was the fair cash value of what the board took to be plaintiff's unit, the fair cash value of its unit was more than this sum. Plaintiff's unit consisted of more than what the board took it to be. It consisted, in addition thereto, of so much of the controlled mileage as was not represented by the stock and bonds owned by plaintiff. Adding the value thereof to the sum of $262,252,566, and then taking 24.9601 per cent. of the total, deducting therefrom the value

of the controlled mileage in Kentucky, taking 60 per cent. of the remainder, and deducting the assessed value of the tangible property, would, as I view it, give the value of the franchise according to the statute. I am unable to make out its value in this way, because there is nothing in the record to show the value of the portion of plaintiff's unit not considered by the board, or the value of that portion of its controlled mileage which was in Kentucky. It is possible that the result of a consideration of these two matters, in the way indicated, would make the value of the portion of plaintiff's unit in Kentucky as much as $92,181,766, the sum at which the board fixed it, by apportioning to Kentucky a part of the value of $262,252,566 on the operated on its own account mileage basis. I doubt, however, whether it would.

The condition of things, then, is this: The board has found the fair cash value of the portion of plaintiff's unit in this state to be $92,181,-766, without any excess value. They have not gone at it in the right way. But they have in fact found such to be its value. It is possible that, if they had gone at it in the right way, they would have found such to be the value thereof. And the consideration to which I referred to in the other case (209 Fed. 463), to wit, that the plaintiff on June 30, 1905, in a suit in this court, claimed that the portion of its railroad in this state, then consisting of 1,265.23 miles, was worth the sum of $70,599,484.81, renders it not unlikely—it would seem, most likely—that the fair cash value of the 1,644.58 miles of plaintiff's railroad in Kentucky, outside the mileage operated by it on account of the owner and by separate corporations in Kentucky for the year ending June 30, 1912, was as much as that sum. I will therefore dispose of the case on the basis that it was that much.

This is not such an exactness as I always like to attain, but the case is one where exactness is not, and only approximation is, attainable. Taking 60 per cent. of $92,181,766 would give $55,309,059.60 as the value of the portion of plaintiff's unit in Kentucky. Deducting $29,500,566, the assessed value of the tangible property, leaves $25,-808,493.60 as the value of the franchise. And deducting from this balance $22,899,300, the amount on which payment has been made, leaves $2,909,192.60 on which payment should yet be made.

A decree will be entered enjoining defendants from enforcing the assessment complained of, and from making and enforcing any other assessment of plaintiff's franchise for the year 1913, on condition that it pays the taxes, state and local, on $2,909,193.60 in addition to what it has paid. But, if either side desires it, the decree may be limited to an injunction against the enforcement of the assessment complained of without prejudice to the making and enforcing of another assessment for that year, to be equalized at 60 per cent., and to be credited with the sum on which payment has been made.